COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-07-423-CV

 

EMILY FARLOW, INDIVIDUALLY                                           APPELLANTS

AND AS NEXT FRIEND OF 

ANDREW JOSEPH FARLOW AND 

LAUREN CATHERINE FARLOW,

MINORS, AND AS GUARDIAN
OF 

THE PERSON AND THE ESTATE
OF

LEE WILLIAM FARLOW, AND

LEE
WILLIAM FARLOW                                                                         

 

                                                   V.

 

HARRIS
METHODIST FORT                                                    APPELLEES

WORTH HOSPITAL AND TEXAS 

HEALTH RESOURCES, INC.

 

                                              ------------

 

               FROM PROBATE
COURT NO. 2 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                          I.  Introduction








This is a medical malpractice case in which
appellants are attempting to impute liability for a doctor=s
negligence to both the hospital where he performed surgery and the hospital=s parent
company.  In six points, appellants
challenge (1) the partial summary judgment on their respondeat superior and
gross negligence allegations, (2) the directed verdict on their vicarious
liability claim based on ostensible agency, and (3) the exclusion of evidence
that they contend is material to their claims. 
We affirm.

                          II.  Factual and Procedural Background

Appellants Emily Farlow[1]
and her husband Lee William Farlow filed a medical malpractice suit on March
31, 2005 against John L. Fewins, M.D.; John L. Fewins, M.D., P.A.; Harris
Methodist Fort Worth Hospital (the Hospital); and Texas Health Resources, Inc.
(THR).[2]  They alleged that Lee went to the emergency
room at the Hospital on April 15, 2004 because of headaches, and the next day
Dr. Fewins, who was the on-call otolaryngology (ENT) specialist at the
hospital, recommended performing an endoscopic transnasal biopsy.  They further alleged that Dr. Fewins
penetrated Lee=s skull during the procedure,
causing permanent damage to his central nervous system.








The Farlows asserted that Dr. Fewins was both negligent
and grossly negligent in performing Lee=s
surgery.  They also asserted that Harris
was vicariously liable for Dr. Fewins=s
actions because he was an employee.  In
the alternative, they claimed that Dr. Fewins was Harris=s
ostensible agent because Harris held out the physicians practicing at the
Hospital as employees.  The Farlows also
claimed that Harris breached a duty to provide Dr. Fewins with the appropriate
equipment necessary to safely perform the procedure.

Harris filed a combined traditional and
no-evidence motion for partial summary judgment on the Farlows=
vicarious liability claims.  Harris
contended that there was no evidence, or no genuine issue of material fact,
that it employed Dr. Fewins or that he was acting within the course and scope
of such employment in treating Lee. 
According to Harris, A[t]he
evidence establishes that Dr. Fewins was an independent contractor engaged in
the private practice of medicine, and . . . there is no factual or legal basis
to support [the Farlows=] allegation that [Harris]
should be vicariously liable for any alleged negligence of Dr. Fewins.@  Harris also moved for summary judgment on the
ground that Dr. Fewins was not its ostensible agent.  The trial court denied the motion in an order
dated August 1, 2007.








Before the trial court ruled on the first motion
for partial summary judgment, the Farlows filed a First Amended Original
Petition, alleging for the first time claims of fraud and negligent
misrepresentation against Harris.  Harris
moved for partial summary judgment on these newly pled claims as well as the
direct negligence and vicarious liability claims that it had previously moved
for summary judgment on.  However, before
the trial court could rule on the second motion, the Farlows filed a Second
Amended Petition deleting the fraud and negligent misrepresentation claims and
adding allegations that Harris was also grossly negligent because it had
ratified Dr. Fewins=s actions and because Dr. Fewins
was acting in a managerial capacity when he performed Lee=s
surgery.  Thus, Harris, with the
agreement of the trial court and the Farlows, again moved for summary judgment
on traditional and no-evidence grounds, based on the claims in the Farlows= Second
Amended Petition.

Harris alleged the following grounds for summary
judgment:

$      The
Farlows= theory of vicarious
liability based upon respondeat superior fails because Dr. Fewins was an
independent contractor and not Harris=s agent or employee.

 

$      Alternatively,
the Farlows cannot produce any evidence that Harris had the right to control
the details of Dr. Fewins=s work.

 

$      The
Farlows= theory of vicarious
liability based upon ostensible agency fails because Harris has not held out
Dr. Fewins as its agent, nor knowingly permitted Dr. Fewins to hold himself out
as its agent.

 








$      Alternatively,
the Farlows cannot produce any evidence that Harris held out Dr. Fewins as its
agent, or knowingly permitted Dr. Fewins to hold himself out as its agent.

 

$      Because
the Farlows cannot establish any type of agency or employee relationship
between Harris and Dr. Fewins, Harris cannot be held liable for gross
negligence.

 

$      Alternatively,
Harris did not authorize or ratify the actions of Dr. Fewins.

 

$      In the
further alternative, the Farlows cannot present any evidence that Harris
authorized or ratified Dr. Fewins=s acts.

 

$      Alternatively,
Dr. Fewins is not a manager of Harris.

 

$      In the
further alternative, the Farlows can present no evidence that Dr. Fewins is a
manager of Harris.

 

$      The Farlows can present no evidence of
either the objective or subjective components of gross negligence.

While the third motion for partial summary
judgment was pending, the Farlows filed a Third Amended Petition, in which they
deleted their direct negligence claims against Harris.  Instead, they added additional factual
support for their allegation that Harris had committed gross negligence through
the actions of its agent, Dr. Fewins.








The trial court granted Harris=s motion
for summary judgment on the Farlows=
respondeat superior and gross negligence theories of liability, as set forth in
the Third Amended Petition.[3]  But it denied Harris=s motion
in all other respects.  Accordingly, only
the ostensible agency theory of vicarious liability against Harris proceeded to
trial, along with the Farlows= claims
against Dr. Fewins.

After the Farlows rested, Harris moved for a
directed verdict on the ostensible agency claim, which the trial court
initially denied.  But Harris reurged its
motion after the defense rested, and the trial court granted it.  As a result, the trial court entered a
take-nothing judgment in Harris=s favor.[4]  This appeal followed.

                 III.  Partial Summary JudgmentCRespondeat
Superior








In their first point, the Farlows challenge the
trial court=s partial summary judgment on
their respondeat superior claims against Harris.  Specifically, they contend that there are
genuine issues of material fact as to whether Dr. Fewins was Harris=s
employee or agent because (1) Harris controlled, or had the right to control,
his medical practice by contract, (2) Dr. Fewins=s status
as an agent or independent contractor is a fact question not appropriate for
summary judgment, (3) there was more than a scintilla of evidence that Dr.
Fewins was acting within the scope of his employment with Harris, and (4) there
was more than a scintilla of evidence that the procedure he performed on Lee
was in furtherance of Harris=s
business.

A.  Standard of Review

A no-evidence summary judgment is proper if the nonmovant
fails to bring forward more than a scintilla of probative evidence that raises
a genuine issue of material fact as to an essential element of the plaintiff=s cause
of action for which the defendant contends no evidence exists.  Moore v. K Mart Corp., 981 S.W.2d 266,
269 (Tex. App.CSan Antonio 1998, pet. denied); see
Tex. R. Civ. P. 166a(i).  A traditional
summary judgment is proper if a defendant conclusively negates at least one of
those essential elements.  IHS Cedars
Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex.
2004); see Tex. R. Civ. P. 166a(b), (c). 
When reviewing both a no-evidence and traditional summary judgment, we
examine the entire record in the light most favorable to the nonmovant,
indulging every reasonable inference and resolving any doubts against the
motion.  Sudan v. Sudan, 199
S.W.3d 291, 292 (Tex. 2006); IHS Cedars Treatment Ctr., 143 S.W.3d at
798.








B.  Applicable Law

Under the doctrine of respondeat
superior, an employer may be vicariously liable for the negligence of its agent
or employee who was acting within the scope of employment even though the
employer did not personally commit a wrong. 
St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 541B42 (Tex.
2002); Baptist Mem=l Hosp.
Sys. v. Sampson, 969 S.W.2d 945, 947 (Tex. 1998); Bell v.
VPSI, Inc., 205 S.W.3d 706, 713 (Tex. App.CFort
Worth 2006, no pet.).  But a person or
entity that hires an independent contractor is generally not vicariously liable
for the tort or negligence of that person. 
Baptist Mem=l Hosp. Sys.,
969 S.W.2d at 947; Enserch Corp. v. Parker, 794 S.W.2d 2, 6 (Tex. 1990);
Redinger v. Living, Inc., 689 S.W.2d 415, 418 (Tex. 1985).  For example, a hospital is ordinarily not
liable for the negligence of a physician who is an independent contractor.  Baptist Mem=l Hosp.
Sys., 969 S.W.2d at 948; Espalin v. Children=s Med.
Ctr. of Dallas, 27 S.W.3d 675, 684 (Tex. App.CDallas
2000, no pet.).








The right of control is the Asupreme
test@ for
determining whether a master-servant relationship exists.  Golden Spread Council, Inc. No. 562 of Boy
Scouts of Am. v. Akins, 926 S.W.2d 287, 290 (Tex. 1996); Omega
Contracting, Inc. v. Torres, 191 S.W.3d 828, 847 (Tex. App.CFort
Worth 2006, no pet.).  In determining
whether a worker is an employee or independent contractor, the focus is on who
has the right to control the details of the work.  Exxon Corp. v. Tidwell, 867 S.W.2d 19,
23 (Tex. 1993); EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.,
176 S.W.3d 330, 336 (Tex. App.CHouston
[1st Dist.] 2004, pet. dism=d).  An independent contractor is one who, in
pursuit of an independent business, undertakes specific work for another using
his or her own means and methods without submitting to the control of the other
person as to the details of the work.  Indus.
Indem. Exch. v. Southard, 138 Tex. 531, 160 S.W.2d 905, 907 (1942); Schievink
v. Wendylou Ranch, Inc., 227 S.W.3d 862, 866 (Tex. App.CEastland
2007, pet. denied).








A contract expressly providing that a person is
an independent contractor is determinative of the relationship absent evidence
that the contract is a mere sham or subterfuge designed to conceal the true
legal status of the parties or that the contract has been modified by a
subsequent agreement between the parties. 
Newspapers, Inc. v. Love, 380 S.W.2d 582, 588B90, 592
(Tex. 1964); Bell, 205 S.W.3d at 713B14;
Weidner v. Sanchez, 14 S.W.3d 353, 373 (Tex. App.CHouston
[14th Dist.] 2000, no pet.).  Evidence
that the parties did not intend for an independent contractor relationship can
come from the contract itself, i.e., whether, despite language describing the
relationship as an independent contractor relationship, other contract language
evidences such a right of control that the relationship is actually that of
employer/employee.  Newspapers, Inc.,
380 S.W.2d at 591C92; Bell, 205 S.W.3d at
713B14.  It can also come from extrinsic evidence,
such as instances of actual control by the principal sufficient to show that
the true agreement of the parties vested a right of control establishing an
employment relationship.  Newspapers,
Inc., 380 S.W.2d at 590B92 (A[T]he >right to
control= remains
the supreme test and the >exercise of control=
necessarily presupposes a right to control which must be related to some
agreement expressed or implied.@); Bell,
205 S.W.3d at 713B14.  In such cases, the exercise of control is
evidentiary only and Amust be so persistent and the
acquiescence therein so pronounced as to raise an inference that at the time of
the act or omission giving rise to liability, the parties by implied consent
and acquiescence had agreed that the principal might have the right to control
the details of the work.@ 
Newspapers, Inc., 380 S.W.2d at 592.








We may consider several factors in determining
the extent of the right of control:  (1)
the independent nature of the person=s
business; (2) the person=s obligation to furnish
necessary tools, supplies, and material to perform the job; (3) the right to
control progress of the work, except as to final results; (4) the time for
which the person is employed; and (5) the method of payment, whether by time or
by the job.  Tex. A&M Univ. v.
Bishop, 156 S.W.3d 580, 584B85 (Tex.
2005); Limestone Prods. Distrib., Inc. v. McNamara, 71 S.W.3d 308, 312
(Tex. 2002).[5]  To trigger vicarious liability, the right to
control must extend to the specific activity from which the injury arose.  Read v. Scott Fetzer Co., 990 S.W.2d
732, 736 (Tex. 1998); Exxon Corp., 867 S.W.2d at 23; Omega
Contracting, 191 S.W.3d at 847.








The right to control is ordinarily a question of
fact; but whether a contract gives a right to control is generally a question
of law.  Omega Contracting, 191
S.W.3d at 847; EPGT Tex. Pipeline, 176 S.W.3d at 336.  In addition, if the controlling facts are
undisputed, whether the relationship that exists is that of an employee or of
an independent contractor is a question of law. 
Dow Chem. Co. v. Bright, 89 S.W.3d 602, 606 (Tex. 2002); EPGT
Tex. Pipeline, 176 S.W.3d at 336. 

C.  Analysis

The Farlows point to both the rights of Harris as
set forth in several contracts between the Hospital and Dr. Fewins and actual
instances of control exercised by the Hospital as evidence that the true
relationship between the parties was that of an employer and employee rather
than an independent contractor relationship. 
Accordingly, we will examine the evidence of both.

1.     Did
the Hospital Retain Right of Control by Contract?

a. 
The Contracts








Dr. Fewins signed several agreements with Harris,
which were in effect when he operated on Lee: 
a Physician Recruitment Agreement with Sign-On Bonus/Relocation
Reimbursement Addendum and Collections Guarantee Addendum; a Secured Promissory
Note; and a Security Agreement.  Phyllis
Norman, an administrator employed by THR, explained the purpose behind the
Hospital=s
entering into these agreements. 
According to Norman, she is responsible, in part, for making sure the
Hospital has sufficient on-call coverage for certain physician
specialties.  In 2003, one of the
specialities for which she was responsible was otolaryngology.  At that time, the Hospital had only two
on-call ENT physicians and were about to lose at least one.  So Norman began to look for a new ENT to
provide at least one-third of the on-call coverage for the Hospital; she
expected that the new on-call doctor would provide coverage for at least one
week every three weeks.  The Hospital
would provide the new doctor with financial assistance in the form of a loan to
set up his or her practice in the Fort Worth area in exchange for the doctor=s
agreeing to apply for active staff privileges at the Hospital and to provide
the Hospital with on-call coverage in his or her specialty for a certain
minimum time;[6]
in this way, the Hospital could bring new physicians to its coverage area.  Norman explained that Harris did not get
involved in setting up the doctor=s
practice, however.








Norman received Dr. Fewins=s resume
and called him to see if he was interested in interviewing with the
Hospital.  He was in the process of
finishing a four-year residency program with University of Texas Medical Branch
at San Antonio.  After talking with him,
she set up an interview with her and other administrators; she also facilitated
meetings with Dr. Fewins and the two other ENTs who provided on-call coverage to
the Hospital.  The Hospital reimbursed
Dr. Fewins for his travel expenses. 
After Dr. Fewins agreed to locate his practice in Fort Worth with the
Hospital=s
assistance, he signed the above-listed contracts.  The Hospital paid him a bonus and reimbursed
his moving expenses;[7]
it reported these amounts to the IRS on a form 1099.

The Physicians Recruitment Agreement provides
that A[t]he
objective of Hospital in the Agreement is to provide incentives to [the doctor]
to practice medicine and for [the doctor] to provide professional services to
patients in the Community [defined as the Hospital=s
service area].@ 
It expressly states that

[a]t all times during the
term . . . [the doctor] is and shall be an independent practitioner and not a
servant, agent, or employee of Hospital. 
Hospital and [the doctor] shall further agree that nothing contained
herein shall be deemed to create any type of employment, agency, servant,
partner, or joint venture relationship between [the doctor] and Hospital.

 

The agreement further provides that the doctor Ashall
exercise his/her own independent medical judg[]ment in his/her practice of medicine
and in the performance of all professional services for his/her patients.@








b.     Contract Requirements That the Farlows
Allege Show a Right of Control Sufficient to Establish Employment Relationship

 

Despite the language stating
that Dr. Fewins was to be an independent contractor of the Hospital, the
Farlows contend that the following obligations in the Physician Recruitment
Agreement show that the Hospital had a right to control Dr. Fewins=s
activities to an extent that at least creates a fact issue as to whether he was
acting as the Hospital=s employee when he operated on
Lee:

$      Dr.
Fewins was obligated to provide one third of the Hospital=s
emergency room ENT coverage unless otherwise agreed, in accordance with the
Hospital=s
medical staff bylaws, rules, regulations, or policies.[8]

$      The
Agreement required Dr. Fewins to Aengage
in the full-time private practice of medicine in the Community . . .
defined as . . . availability to see patients at least 35 hours per week for 48
weeks during any calendar year.@
[Emphasis added.]

$      Dr.
Fewins agreed to maintain complete and accurate medical record documentation on
each of the patients he saw at the Hospital.

$      Dr.
Fewins was required to obtain and maintain active staff privileges at the
Hospital.








$      Dr.
Fewins agreed not to enter into a private practice recruitment or similar
agreement with any other hospital or health care system, or to accept money for
such a recruitment.

$      Dr.
Fewins agreed to Aprovide a reasonable amount of
care for indigent patients both in [his] office and to Hospital inpatients@ and to
provide services without discrimination as to the Apayor
source, including but not limited to Medicare and Medicaid.@

$      Dr.
Fewins was required to, at the Hospital=s
reasonable request, participate in any health maintenance or preferred provider
organization, accountable health plan, or network in which the Hospital
participates.

$      The
agreement provided that Dr. Fewins would cooperate with the Hospital=s
compliance officer as needed to carry out the corporate compliance program.

$      Dr.
Fewins agreed to provide, during the term of the agreement and for three years
thereafter, any information reasonably requested by the Hospital related to his
professional services and collections for audits, tax filings, or other
financial or regulatory matters.

$      Dr.
Fewins agreed to provide the Hospital upon request with all authorizations
necessary to provide the Hospital information regarding expenses incurred by
Dr. Fewins in setting up his practice.








The term of the Physician Recruitment Agreement
was four years, beginning on the date Dr. Fewins was granted staff
privileges.  Norman testified that he
probably obtained his initial temporary privileges around August 2003.  The agreement provided for early termination
upon breach by Dr. Fewins, such as his failure to maintain active staff
privileges at the Hospital.

The Sign-On Bonus/Relocation Reimbursement
Addendum to the Agreement stated that if Dr. Fewins

fails to obtain or maintain privileges as a
member of the Medical Staff of Hospital, or to maintain the Full-time Practice
of medicine in the Community as required by Paragraph 1 of the Physician
Recruitment Agreement, [Dr. Fewins] shall immediately, upon demand, pay to
Hospital the unamortized amount of the total sums paid or reimbursed to [him]
pursuant to this Addendum.

Additionally, the Collections Guarantee Addendum
provided that during the first year after the effective date of the Physician
Recruitment Agreement, the Hospital would advance to Dr. Fewins a certain
monthly amount that the Hospital had calculated was approximately what an ENT
starting a private practice in the Fort Worth area would earn (the Guarantee
Amount).  Beginning with the second
month, the Hospital would advance the same monthly amount, less the amount of
Dr. Fewins=s collections from that month; Acollections@ was
defined as








all cash collected by or
on behalf of [the doctor] from patients or other payors for [the doctor=s] medical services
regardless of where such services are provided or to whom, including emergency
room coverage, and all amounts earned from [the doctor=s] practice of medicine
or from any other source concerning medical or medical related matters.

 

The guarantee was structured as a loan to Dr.
Fewins, and the repayment thereof was secured by a Secured Promissory Note and
Security Agreement.  Dr. Fewins was
required to provide the Hospital with a monthly report of all collections from
his medical practice to facilitate payment of the monthly advances.  At the end of the term, if the total of Dr.
Fewins=s
collections plus advances from the Hospital during the term exceeded the
Guarantee Amount, he was required to repay the Hospital for any amounts it had
advanced.  On the other hand, if the
collections plus advances were less than the Guarantee Amount, the Hospital
would pay Dr. Fewins the difference. 
Here, Dr. Fewins=s collections plus advances from
the Hospital exceeded the Guarantee Amount; thus, he had to repay the Hospital
for those advances at the end of the term. 








The Collections Guarantee Addendum also provided
that after the initial one-year term, any amount the physician owed for
advances would be forgiven each month when due, provided that no event of
default had occurred under the Physician Recruitment Agreement.  In other words, this provision allowed the
Hospital to forgo repayment of the monthly amount due for advances so long as
the doctor continued to perform under the Physician Recruitment Agreement.  Here, however, Dr. Fewins repaid all of the
advances.

c. 
Conclusion








Viewed in their entirety, the Physician
Recruitment Agreement and its ancillary contracts evidence an intent by the
Hospital to assist Dr. Fewins in setting up a private practice in the Hospital=s
service area and to provide Dr. Fewins financial assistance in setting up this
private practice in the form of a loan (if his collections met the parties=
expectations) or a guarantee (if his collections did not meet the parties=
expectations).  This arrangement provided
the Hospital with a guaranteed one-third of its need for ENT on-call coverage
for at least one year.[9]  The provisions that the Farlows contend show
a right of control over Dr. Fewins=s
practice are in reality for the purpose of ensuring that the recruited doctor
could financially continue to practice in the Hospital=s
service area; otherwise, the Hospital would not be able to maintain this
certainty of on-call coverage in that speciality, thus frustrating the very
purpose of the agreement.  Cf. St.
John v. Pope, 901 S.W.2d 420, 424 (Tex. 1995) (holding that on-call status
of physician, without more, does not establish that physician owes duty to
patient); Baptist Mem=l Hosp.
Sys., 969 S.W.2d at 948B49
(declining to impose nondelegable duty on hospitals for malpractice of
emergency room physicians).

The majority of the provisions that the Farlows
point to as establishing a right of control over the details of Dr. Fewins=s workCsuch as
the obligation to provide financial records and to engage in his private
practice at least 35 hours per week for 48 weeks during any calendar yearCfunction
to safeguard the money advanced by the Hospital, either by repayment of the
money advanced or by continued emergency room coverage by the physician.  Other provisions relate only to corporate
compliance.[10]  See Bell, 205 S.W.3d at 714, 721
(holding that requiring a worker to comply with applicable laws, regulations,
and safety requirements does not show a right of control over the details of
how a worker performs his or her job).








As to the provision requiring Dr. Fewins to
participate in any HMO, PPO, or health care organization the Hospital
participates in, Norman explained that this is good for the patients, and Dr.
Fewins was not required to sign up for the over 100 plans the Hospital
participated in at that time.  She
explained that he only needed to comply with any reasonable request by the
Hospital to participate in any such plan, but she was not aware that the
Hospital had ever made such a request of Dr. Fewins.  Additionally, she stated that the new doctors
usually found out over the course of time and by word of mouth which plans were
the best ones and that the best plans might vary by hospital.  Accordingly, while this provision attempts to
control a desired resultCi.e., to facilitate the
treatment of patients, processing of claims, and payment to the doctors and
Hospital for services renderedCit does
not show a right to control the details of Dr. Fewins=s work
to the extent that it shows the independent contractor language is a mere sham.

Additionally, although Dr. Fewins was required to
maintain active staff privileges at the Hospital, the agreement specifically
states that he was not prohibited from applying for or maintaining privileges
at any other hospital or utilizing or admitting patients to any other
hospital.  Moreover, the agreement
specifically provides that Dr. Fewins was not required to Aadmit
patients to Hospital or to utilize Hospital to provide inpatient, outpatient or
any other services to patients or otherwise generate business for Hospital.@  Norman testified that simply having staff
privileges did not mean a physician had to take on-call coverage.  For instance, physicians over the age of
sixty could maintain active staff privileges without participating in on-call
coverage.








The Farlows point out that under the Hospital=s
Medical Staff Bylaws, Dr. Fewins was contractually obligated to respond when
the emergency room doctor who saw Lee referred the case to Dr. Fewins as the
on-call ENT.  Specifically, he was
required under the Bylaws to do the following:

(b)    provide
for continuous care of his patients by personally attending the patients or by
arranging for coverage for his patients by another Member of the Medical Staff,
who holds the same or substantially the same clinical privileges as determined
by the Credentials Committee.  Each
Member shall arrange for such coverage at any time he is not available even if
he currently has no patients who are in the Hospital;

 

. . . .

 

(f)     not
delegate responsibility for diagnosis or care of Hospital patients to a
practitioner who is not a member of the Medical Staff with requisite
privileges; [and]

 

. . . .

 

(k)     cooperate with Members, nurses, Hospital
Administration and others so as not to adversely affect patient care and/or the
orderly administration of the Hospital.








But these requirements are likewise
results-oriented only, evidencing an intent that no patients being seen at or
admitted to the Hospital are left without care by a responsible doctor having
privileges at the Hospital.  They do not
direct how or to whom the doctor must delegate such care; they simply ensure
that no patient will be medically unattended while at the Hospital.  Moreover, the Bylaws are adopted by the
governing Medical Board, made up of doctors holding staff privileges at the
Hospital:  the Chief of Staff, Vice
Chief, Communication and Performance Director, and Chiefs of each division.[11]  The Bylaws apply equally to on-call
physicians with staff privileges as well as physicians with staff privileges
who admit their patients to the Hospital after seeing them in their own
offices.

Accordingly, even considering the undisputed
evidence of the contract provisions pointed to by the Farlows, there is no
evidence raising a fact issue as to whether the contract between the Hospital
and Dr. Fewins was a mere sham or subterfuge designed to conceal the true legal
status of the parties.

2.     Extrinsic Evidence








According to the Farlows,
evidence of actual instances of control by the Hospital over Dr. Fewins=s
practice also shows that the true relationship between the parties was an
employment relationship.  They
specifically point to the following: 
evidence that (1) Dr. Fewins used the Hospital=s
equipment instead of his own to perform the surgery on Lee; (2) a Hospital
employee, the supervising nurse, assigned the room and scheduled the surgery;
and (3) the Hospital employed the nurses assigned to assist Dr. Fewins with the
surgery, and Dr. Fewins did not schedule or request those nurses; instead, he
simply had to work with the nurses that the Hospital scheduled to work in the
operating room that day.[12]

Additionally, the Farlows point to Norman=s
deposition testimony that when Dr. Fewins was on-call, he was required to
respond, at least by telephone, within thirty minutes after being called by the
emergency department.  According to
Norman,

If you=re on call . . .,
whether it=s a week or for a day,
your responsibility is to, when called by the emergency department, to respond
within 30 minutes, at least on the phone to talk with them within 30 minutes
and then discuss the case, determine if there is a need to physically go to the
hospital, see the patient.  If it=s a surgical specialty,
maybe to take a patient to surgery or perform a procedure within the emergency
department.  Or another option would be
after talking with the emergency department physician, to determine that this
is something, for instance a nose bleed that could be packed and the patient
sent to the physician=s office either that day
or the next day.

 








The Farlows characterize this testimony as meaning that Dr. Fewins was
required by the Hospital to Aconsult
with and treat the patients at [the Hospital] whenever necessary.@








Although we agree that this language shows that
Dr. Fewins had an obligation to respond when consulted by the emergency room,
this obligation applied to all doctors with staff privileges who participated
in on-call coverage at the Hospital, according to the Rules and Regulations
promulgated by the medical staff.  Dr.
Fewins testified that he had not actually been scheduled to be on-call the week
he performed Lee=s surgery; he was substituting
for another of the on-call ENTs. 
According to Dr. Fewins, although he had stated in the past that the
on-call schedule was set by the medical affairs department of the Hospital, he
meant that, ultimately, the schedule was Aput out
and published by@ the Hospital, but the doctors
informally determined, on their own, when they would each take on-call
coverage.  He testified, A[I]t=s a
combination of us as a team, as a community . . . .  It=s an
unwritten agreement.@ 
Thus, the doctors themselves would Aultimately
alert the medical affairs office as to how [they] propose it [the on-call
schedule] be divided up,@ and they would also have the
right to trade with any of the other doctors on the list.  Thus, we do not believe that these
obligations by on-call physicians at the Hospital show that the Hospital
exercised actual control over the details of Dr. Fewins=s work
that was Aso persistent and the
acquiescence therein so pronounced as to raise an inference that at the time of@ Lee=s
surgery, Athe parties by implied consent
and acquiescence had agreed that [the Hospital had] the right to control the
details of the work.@ 
Newspapers, Inc., 380 S.W.2d at 592.








Moreover, considering the Limestone
factors, nothing here shows that the facts the Farlows point to as evidencing
actual instances of control interfered with the independent nature of Dr.
Fewins=s
work.  Dr. Fewins testified that although
he used the Hospital=s tools in performing the
surgery, he and other doctors were free to use their own tools.  The evidence also shows that patients paid
Dr. Fewins directly for his services and that the Hospital billed separately
for its services.  Although there is
evidence that the Farlows never received a bill from Dr. Fewins for the
surgery, but they did from the Hospital, there is no indication that any of the
Hospital=s bills
purport to recover for Dr. Fewins=s
services.  Additionally, Dr. Fewins was
on-call only once every three weeks for one week at a time, and he was not
required to have any presence at the Hospital during that time unless he was
specifically contacted by the emergency room about an ENT patient.  Further, we have already explained that the
patient care requirements imposed by the contract and the Hospital=s Bylaws
are results-oriented and not related to the control of the details of Dr.
Fewins=s
work.  Accordingly, even considering the Limestone
factors, the Farlows have not shown that the Hospital exercised a right of
control sufficient to raise a fact issue on their respondeat superior claim.[13]








Finally, the Farlows urge in their reply brief
that only Asome control@ is
required to establish vicarious liability for the acts of an independent
contractor, in accordance with the Restatement (Second) of Torts and Redinger,
689 S.W.2d at 418.  But the Farlows did
not plead this theory of vicarious liability, only respondeat superior and
ostensible agency.  Nor did they raise
this theory in the summary judgment proceedings.  See Brookshire v. Longhorn Chevrolet Co.,
788 S.W.2d 209, 213 (Tex. App.CFort
Worth 1990, no writ) (holding that appellate court can only consider material
on file with trial court as of time summary judgment granted).

Accordingly, we conclude and hold, based on the
undisputed facts and the appropriate standards of review, that the trial court
did not err by granting partial summary judgment as to the Farlows=
respondeat superior claims against Harris.

                                     IV.  Ostensible Agency

In their second issue, the Farlows challenge the
trial court=s directed verdict on their
vicarious liability claim based on ostensible agency.

A.  Standard of Review

A directed verdict is proper only under limited
circumstances: (1) when the evidence conclusively establishes the right of the
movant to judgment or negates the right of the opponent or (2) when the
evidence is insufficient to raise a material fact issue.  See Prudential Ins. Co. v. Fin. Review Servs.,
Inc., 29 S.W.3d 74, 77 (Tex. 2000); Hogue v. Propath Lab., Inc., 192
S.W.3d 641, 646 (Tex. App.CFort
Worth 2006, pet. denied).  In reviewing a
directed verdict, we must credit favorable evidence if reasonable jurors could and
disregard contrary evidence unless reasonable jurors could not.  See City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005).








If the question to be decided is whether the
party opposing the directed verdict raised a material fact issue, we consider
all the evidence in a light most favorable to the party against whom the
verdict was instructed and disregard all contrary evidence and inferences; we
give the opposing party the benefit of all reasonable inferences created by the
evidence.  Coastal Transp. Co. v.
Crown Cent. Petroleum Corp., 136 S.W.3d 227, 234 (Tex. 2004).  If we determine that any conflicting evidence
of probative value raises a material fact issue on any theory of recovery, then
the directed verdict is improper because such an issue is for the jury to
resolve.  Szczepanik v. First S. Trust
Co., 883 S.W.2d 648, 649 (Tex. 1994).

B.  Applicable Law








An individual or entity who engages an
independent contractor, and thus would not normally be vicariously liable for
the independent contractor=s
negligence, may nevertheless act in a manner that makes the person or entity
liable for the independent contractor under the doctrine of ostensible
agency.  See Baptist Mem=l Hosp.
Sys., 969 S.W.2d at 947.  Liability
may be imposed under the doctrine of ostensible agency in circumstances in
which the principal=s conduct should equitably
prevent it from denying the existence of an agency.  Id.; Coker v. Cramer Fin. Group,
Inc., 992 S.W.2d 586, 595 (Tex. App.CTexarkana
1999, no pet.).  Ostensible agency in
Texas is based on the notion of estoppel, that is, a representation by the
principal causing justifiable reliance and resulting harm.  Baptist Mem=l Hosp.
Sys., 969 S.W.2d at 948; Ames v. Great S. Bank, 672 S.W.2d 447,
450 (Tex. 1984).

Texas courts have applied these basic agency
concepts to many kinds of principals, including hospitals.  Baptist Mem=l Hosp.
Sys., 969 S.W.2d at 948.  A
hospital may be vicariously liable for the medical malpractice of independent
contractor physicians when plaintiffs can establish the elements of ostensible
agency.  Id.  The elements of ostensible agency are that
(1) the principal, by its conduct, (2) caused a third party to reasonably
believe that the putative agent was an employee or agent of the principal, and
(3) that the third party justifiably relied on the appearance of agency.  Id. at 948; Garrett v. L.P.
McQuistion County Hosp., 30 S.W.3d 653, 655B56 (Tex.
App.CTexarkana
2000, no pet.); Restatement (Second) of Agency ' 267
(1958).

C.     Evidence
Presented at Trial

1.     Emily
Farlow

a.      Events
at Hospital








Emily Farlow testified that she did not see Lee
in the Hospital the night he went to the emergency room because she had to stay
home with their two children.  But when
she helped load him into his parents= car for
them to take him to the Hospital, he was Aincapacitated@ and
could not sign any forms; A[h]is
headache was so bad he couldn=t even
talk. . . .  [T]here=s no way
he could have concentrated and focused and actually read something.@  She testified that Lee=s mother
said the Hospital had given him Atons of
pain medication stronger than morphine.@

Emily joined Lee at the Hospital the next
morning.  She stayed with him until
around dinnertime.  While Emily was at
the Hospital, Lee was incoherent most of the time and Apretty
much out of it.@ 
Lee was not able to participate in giving one of the nurses his medical
history.  That afternoon a nurse told
them that ALee=s
surgery had been rescheduled until Saturday morning because the operating room
was so backed up.@

Emily did not have personal knowledge of any
discussions between Lee and the nursing staff or any doctors when Lee went into
the Hospital on April 15 because she was not there, nor was she there on the
16th when Dr. Fewins saw Lee.  When cross-examined
about the Hospital=s records, Emily admitted that
none of the records said that Lee was incoherent.








Emily was not aware exactly how Dr. Fewins got
involved in Lee=s care.  A physician from Lee=s
nephrologist=s practice actually admitted Lee
to the Hospital.  When asked if, at the
time Lee was suffering the headache, the doctors who would be treating him were
employees or independent contractors, she said, Ayes.@  Emily thought Dr. Fewins was an employee
because A[w]e
went to the emergency room not knowing what kind of doctor we needed.  We just needed care.  And the emergency room, who I felt was the
hospital, sent Dr. Fewins to us, so I thought he was an employee of the
hospital.@ 
She said there was no choice in who was to perform the operation and
that the Hospital selected Dr. Fewins to perform it.  When asked if Dr. Fewins=s
independent contractor status would have kept her from allowing him to treat
her husband, Emily answered, 

I don=t know if it would have
kept me, but I know that when they said that, you know, an ENT is going to come
and do surgery that day, I didn=t question that ENT because I had full faith that
the hospital had only the best, most-qualified doctors there to care for them
so I put all of my trust in that.

 

Emily testified that on the day of the surgery,
she was all alone in the surgical waiting area until Dr. Fewins came out to
talk to her.  He was wearing scrubs but
she does not recall him wearing a badge. 
At that time, Emily signed a consent form for an angiogram for Lee; she
did not notice whether it said the doctors were not employees of the Hospital.

b.     Consent
Forms

Harris introduced a AUniversal
Consent for Treatment@ form that Lee signed when he
was admitted to the emergency room on April 15, 2004.  A paragraph in the middle of the page states
as follows:








Independent physicians.  I acknowledge that the doctors taking part in
my care do not work for the Hospital. 
They are engaged in the private practice of medicine, and are not
employees, servants or agents of the Hospital. 
In addition to my attending doctor, other doctors who may take part in
my care may include radiologists, pathologists, anesthesiologists, neonatologists,
cardiologists, emergency physicians and other specialists.  I acknowledge that the Hospital is not
responsible for the judgment or conduct of doctors who treat or provide a
professional service to me.  The
exception to this is that some medical residents -- doctors taking part in a
program of post-graduate medical education under the supervision of more
experienced physicians -- are employees of the Hospital.[[14]]

 

Harris questioned Emily as to whether it would be
reasonable for a doctor to rely on a signed consent form as a patient=s
representation that he or she had read it; she said no.  Although Emily was not there when Lee signed
the document, she suspected that he did not read it.  When asked if the signature was Lee=s, she
said, AIt looks
like an impaired version of his signature, obviously in distress.@  The letters were scrunched up, and it was not
as Afree-flowing@ as his normal
signature.








Harris also introduced a Hospital consent form
that Lee had signed about three weeks before the surgery.  Lee=s
nephrologist had biopsied his kidney at the Hospital, and Lee signed the same
consent form that included the language quoted above.  Emily was not with Lee that day, so she did
not know his condition when he signed the form. 
But she also testified that the language on the form says only that the
doctors participating in Ayour care@ are not
employees; the only doctor she knew who was participating in Lee=s care
for that visit to the Hospital was his nephrologist, who had his own office and
practice, so she knew he was not an employee. 
According to Emily, Ain my
mind, it was the belief that when you go see a doctor at their office, they=re not
affiliated with the hospital, they=re not
employees of the hospital.  But when you
go to the hospital to see a doctor, that they are employees of the . . .
hospital.@ 
She also thought Lee=s
nephrologist=s partner, who admitted Lee to
the Hospital, was not a Hospital employee because she knew him as the outside
doctor=s
partner.  Her understanding of how Dr.
Fewins came to treat Lee was that the doctor who saw Lee initially in the
emergency room, Dr. Chase, Alooked
on the wall of the emergency room for the ENT specialist and [Dr. Fewins=s] name
was there.@ 
According to Emily, she and Lee had no input into who would treat Lee;
both Dr. Fewins and Dr. Ellis, the neurologist who treated Lee after the
surgery performed by Dr. Fewins, were selected by the Hospital.








Harris additionally introduced consent forms that
Emily signed when she went to the Hospital for a lactation consultation after
her son was born and when she was admitted to the Hospital to give birth to her
daughter.  These forms contain
independent contractor language substantially similar to that quoted above.  But Emily said she did not read these
documents, and she was in labor when she signed the second one.

The defense also questioned Emily about a consent
form Lee signed on the 17th, before his surgery.  The form does not state that the physician is
an independent contractor, but it likewise does not hold out the physician as
an employee.  It merely provides informed
consent as to some of the risks of the surgical procedure that was to be
performed.

Emily admitted that she did not know Lee=s
condition when he signed this form because she was not able to get to the
Hospital until after Lee had been taken into surgery.  She likewise did not know Lee=s
condition or how much drugs he had been given at that point.  When she had been there with him in the
emergency room on the 16th, the day before the surgery, he was Ain and
out,@
intermittently incoherent, not able to stand, and lying down when talking to
her.  She thinks this had to do with the
pain medication as it wore off and took effect. 
However, when Emily talked to Lee by phone on the evening of the 16th,
his headache was gone or almost gone, he was not in pain, and he was speaking
normally.[15]








c.      Why
the Farlows Chose Harris

According to Emily, she selected the Hospital
because Lee was going to see its doctors and she thought of the Hospital as the
better hospital of those available.  She
did not know what type of doctor Lee needed, which is why she sent him to the
emergency room.  Emily testified that she
understood that when you see a doctor at his or her office, and the doctor then
schedules a procedure in the Hospital, that doctor is not an employee; however,
she did not know whether Dr. Fewins had his own practice when he treated Lee at
the Hospital. 

d.  AI Am
Harris@ Advertising Campaign

Emily testified that she decided to have her
daughter at the Hospital and that she was influenced in that decision by the AI Am
Harris@
advertising campaign.  According to
Emily, she thought the doctors who worked at Harris hospitals were employees
because Athe
pictures in the advertising portrayed people in lab coats, they have
stethoscopes. . . . [T]hey look like doctors.@  She admitted that not all of the pictures
portray people who look like doctors but that Asome of
these people are -- could be doctors.@








She believed the Hospital
was different from other hospitals because [t]hey were willing to put their
employees out there.  They were backing
them up by putting them on the billboard saying what great quality they were,
what great care you were going to get, and I really felt like they were putting
their trust in their employees.  And if
they would do that, then I would too.

 

Emily testified that the advertising campaign
also influenced her decision to have her parents take Lee to the Hospital
emergency room for his headache.  She
stated,

I didn=t know what kind of
doctor I needed.  And I felt like the
doctors were their employees of the hospital that they were putting out there
saying trust us, we care, the doctors care, the nurses care, all the employees
care, and they are of the utmost quality. 
They will take care of you.  And I
wanted to go where I was going to get a good doctor. . . .  I needed a good doctor.

 

Emily thought the doctors in the Hospital=s
emergency room were employees because Athe
people in their advertising campaign look like doctors. . . .  We were going to see the doctor in the
hospital.@

According to Emily, the Harris advertisements
were even more critical in her decision to send Lee to the Hospital than they
were when they decided to have their daughter there.  She explained,








[M]y belief, driving
through town over all the time and looking at those ads, is that they are
putting their trust - - they are putting their people up there saying our
employees are the hospital and we will stand behind our employees.  And the people in the ads[,] I didn=t know that they were not
doctors.  They look like doctors, they
look like nurses, they look like technicians. 
They=re all the employees of
the hospital that you go see at that hospital. 
And I trusted them because when you put your employees out there saying
come see me for my employees, you are - - as a hospital you are going to
recruit and hire and train the very best people that you think are going to do
the very best job.  That=s my belief.

 

She took a great deal of comfort from the advertisements.

Emily testified about the advertisements showing
people who she thought looked like doctors. 
A part of one advertisement in particular reads, AThe
employees of Harris Methodist Hospitals are the hospital.  They are the ones who help couples become
parents.  And patients become
survivors.  They are the nurses, lab
technicians, admissions specialists, cafeteria servers and so many others who
carry out each task with skill and compassion.@  Emily did not remember reading this specific
part of the advertisement before Lee=s
surgery.  Another part of the same
advertisement says that the physicians on the hospital=s staff
are Aindependent
practitioners who are not employees or agents of Harris Methodist Hospitals.@  But Emily said she had not read that part of
the advertisement either.








Emily identified exhibits of pictures of Harris
billboards as showing people who could be doctors.  When asked whether the fact that a person on
the billboard had a stethoscope necessarily meant that the person was a doctor,
Emily answered, AI believed them to look like
doctors.@  Harris admitted exhibits showing language on
the billboards that specifically identifies the people on them as a respiratory
therapist, lab technician, and other nonphysician employees.  Emily agreed that nothing in the
advertisements says that the person being portrayed is a physician and that
there was no advertisement that said people should go to Harris hospitals
because the doctors are employees.  But
she was under that impression because of the appearance of the people in the
advertisements.

Emily admitted that she and Lee never talked
about the advertisements; she does not know what he assumed or inferred from
them.  She also admitted that she never
saw Dr. Fewins=s image on any Harris media.

Some of the advertisements introduced by the
Farlows do not have language indicating that the doctors are not
employees.  For example, one of the
images shows a woman who looks like a doctor because she is wearing a white
coat and has a stethoscope.  Emily testified
that she relied on that image. 

On cross-examination, Harris questioned Emily
about one of the advertisements, which clearly says in big print, AI am an
individual on the hospital=s
nursing team.@ 
Emily did not remember reading that billboard and said that she had
never seen people who are not doctors wearing lab coats.

2.     John
Farlow








Lee=s father
John Farlow also testified regarding his impression of whether Dr. Fewins was a
Hospital employee.  According to John, he
and his wife took Lee to the Hospital that night because they had had good
experiences there in the past and because of the AI Am
Harris@
advertising campaign.  Lee never said
that he wanted to go to the Hospital; it was just understood.  But John agreed that he would have taken Lee
to the Hospital regardless of the advertising.

John testified that when he and his wife took Lee
to the Hospital, Lee was lying in the backseat in the fetal position in a lot
of pain; he was not able to communicate other than to give yes and no
answers.  After John dropped Lee and his
wife Marty off at the emergency room and parked the car and came back in, they
had already been checked through the front desk.  Lee was still in Aextreme
pain@ and was
not able to stand up; he was bent over with his knees on his elbows.  He did not know about any paperwork Lee
signed stating the doctors are independent contractors.  He was never present for any discussions
between Lee and any of the doctors.

On cross-examination, John testified that he had
a long-standing relationship with the Hospital and had always had good
experiences there and that he and his wife had even been patients there several
times.

According to John, Harris=s
advertising played a part in the family=s
decision to take Lee to Harris even though John had just had surgery at Plaza
Medical.  He related,








I had seen the ads that said, AI Am
Harris@ and
showed pictures of the staff and employees and doctors and nurses there at
Harris.  They were just one big happy
family, and they represented themselves as a caring medical professional
operation, so I felt like Lee would get a -- good medical care there.

According to John,

We knew that if . . . they were not going to
stand behind their . . . staff, they would . . . not say AI Am
Harris.@  They would say I am an independent contractor
working at Harris Hospital.  But they
didn=t say
that.  They . . . really
implied and told us that . . . they were Harris Hospital.  These employees, these doctors, nurses, they
were Harris.

He thought the advertisements portrayed doctors because Awhen you
see a person with a lab coat and with a stethoscope around their neck with a
hospital badge you think they=re
doctors.@  

John admitted on cross-examination that he and
Emily did not discuss the billboards and advertisements before April 15, 2004,
the day he and Marty took Lee to Harris. 
He could not recall anything about in the advertisements he saw before
April 15, 2004 other than the pictures and the AI Am
Harris@
slogan.  In looking at the advertisements
with the Farlows= attorney, he did not recognize
any of the people in them.

3.     Marty
Farlow








Marty Farlow, Lee=s
mother, also testified about Lee=s
condition the night they took him to the Hospital.  According to Marty, Lee was curled in the
fetal position in terrible pain; in the car, he was Aall
curled up, holding his head . . . [and] kind of muttering.@  At times, he was not making much sense.  Once they got him to a room, they gave him
medicine, but Ait didn=t do
much,@ so they
gave him morphine.  He received another
dose of pain medication after that.

D.     Analysis

The Farlows contend that the directed verdict was
improper because sufficient evidence exists to show that the Farlows reasonably
relied on Harris=s affirmatively holding out its
doctors as employees such that they were justified in believing Dr. Fewins was
Harris=s
agent.  They specifically point to the
following as showing that Harris affirmatively held out its doctors as
employees:  (1) the AI Am
Harris@
advertising campaign, (2) Athat Lee
Farlow went to seek medical treatment from a hospital who, in turn, called in a
doctor to treat Lee,@ (3) that Dr. Fewins wore scrubs
that said, AProperty of Harris Methodist
Fort Worth Hospital@ on them, (4) that Dr. Fewins
had a Hospital badge that did not say he was an independent contractor, and (5)
that a sign in one of the waiting rooms read as follows:

THIS WAITING AREA IS
GIVEN

TO HONOR OUR DEDICATED

PHYSICIANS, NURSES,

AND MEDICAL STAFF

 

PAUL AND VIRGINIA DORMAN








The trial court did not admit the writing on the
scrubs and the waiting room sign into evidence at trial.  Thus, we do not consider that evidence in our
determination of whether the directed verdict based on the evidence at trial
was proper.  See Natural Gas
Clearinghouse v. Midgard Energy Co., 113 S.W.3d 400, 411 (Tex. App.CAmarillo
2003, pet. denied) (holding that when directed verdict is reurged after defense
presents its evidence, trial court must consider all evidence before jury,
including evidence presented by defense). 
Additionally, our supreme court has rejected the Farlows=
argument that ostensible agency arises simply by virtue of a doctor=s
on-call status.  Baptist Mem=l Hosp. Sys.,
969 S.W.2d at 949; Garrett, 30 S.W.3d at 656.  Thus, we are left with the advertising
campaign and Dr. Fewins=s Hospital badge as potential
evidence showing an affirmative holding out that Dr. Fewins was Harris=s agent.








Emily testified that she did not recall seeing
Dr. Fewins=s badge.  When shown a picture purporting to be a copy
of Dr. Fewins=s badge, Emily again said that
she did not recall seeing it, noting that A[b]y the
time I met him, I wasn=t paying attention to the badge.@  Additionally, there is no testimony that Lee
ever saw or formed an opinion based on the badge.  Thus, even assuming that the badge could be
considered a holding out by the Hospital, there is no evidence that either of
the Farlows reasonably relied on it in forming a belief about agency.  See Denton v. Big Spring Hosp. Corp.,
998 S.W.2d 294, 296B97 (Tex. App.CEastland
1999, no pet.) (noting, in holding that hospital did affirmatively hold out
emergency room doctor as employee through radio advertisements, that patient
testified he had never heard the advertisements).








Likewise, even if the advertising could be
construed as an affirmative holding out by the Hospital to the Farlows that the
doctors working there are employees rather than independent contractors (as
evidenced by Emily=s testimony that the advertising
was confusing because she thought the people in lab coats were doctors),[16]
the evidence shows that the Hospital took steps to alleviate any such
impression by including language in its admission paperwork affirmatively
stating that the doctors are independent practitioners rather than employees.  Lee and Emily had both signed this paperwork
in the past, and Lee signed such paperwork when he was admitted.  The inclusion of such language in admission
paperwork negates any prior holding out by a hospital, even if the patient did
not read the paperwork.  See Baptist
Mem=l Hosp. Sys.,
969 S.W.2d at 950; Valdez v. Pasadena Healthcare Mgmt., Inc., 975 S.W.2d
43, 45B46, 48
(Tex. App.CHouston [14th Dist.] 1998, pet.
denied); see also Garrett, 30 S.W.3d at 657 (AA
hospital must clarify for its patients its relationship with a doctor only to
the extent that the hospital or the doctor has affirmatively held out that the
doctor is its agent or employee.@); Denton,
998 S.W.2d at 296B97 (holding that plaintiff did
not raise fact issue to defeat summary judgment when defendant showed that
plaintiff signed, but had not read, consent form stating that doctors were
independent contractors).  Moreover,
there is no evidence that Lee saw or relied on the advertisements.  See Denton, 998 S.W.2d at 297.  Accordingly, we conclude and hold that the
evidence presented at trial is insufficient to raise a material fact issue on
ostensible agency; therefore, the trial court did not err by directing a
verdict for Harris on that claim.  We
overrule the Farlows= second point.

V. 
Ratification and Managerial Capacity








In their third point, the Farlows contend that
the trial court erred by granting summary judgment on their allegation that
Harris is liable for Dr. Fewins=s gross
negligence because it ratified his unauthorized act of penetrating Lee=s skull
and brain during the surgery. 
Specifically, the Farlows contend that Harris ratified Dr. Fewins=s
actions by (1) billing them for its services in connection with the surgery,
(2) allowing Dr. Fewins to retain his staff privileges at the Hospital, (3)
refusing to distance itself from Dr. Fewins during the trial, (4) failing to
apologize for Lee=s injury until the eve of trial,
even contending that Dr. Fewins had not violated the standard of care, and (5)
allowing Dr. Fewins to continue treating Lee, including allowing him to be in
the operating room when Dr. Ellis, a neurosurgeon, subsequently operated on Lee
and letting him talk to the Farlow family in the waiting room during that
surgery.  In their fourth point, the
Farlows contend that the trial court erred by granting summary judgment on
their claim that Harris is liable for Dr. Fewins=s gross
negligence because he was acting in a managerial capacity as to the Hospital=s
employeesCthe nursesCwhen he
performed Lee=s surgery.

Harris contends that, regardless of whether
summary judgment was proper as to the Farlows= allegations
that Harris is liable for Dr. Fewins=s
gross  negligence,[17]
the point is moot because the jury found that Dr. Fewins was not grossly
negligent and the parties have stipulated that even if this case is reversed,
the damages verdict against Dr. Fewins will stand and not be retried.








Although the Farlows contended in their reply
brief that the issue of ratification is not moot because Harris Acould be
liable in negligence . . . if ratification can be established,@ they
did not plead ratification as a theory of vicarious liability for negligence;
instead, they pled it solely as a basis for holding Harris liable for gross
negligence upon the finding of an employee or agency relationship between Dr.
Fewins and Harris.  [Emphasis
added.]  Harris moved for summary
judgment as to the pled allegations regarding ratification and managerial
capacity on the grounds that they were pled as theories of gross negligence
liability, and the Farlows acknowledged that their allegations were limited to
gross negligence in their responses to the motion for summary judgment.  Additionally, the trial court=s
summary judgment order specifically states that Aany and
all of [the Farlows=] claims for gross negligence
against . . . Harris . . . are DISMISSED WITH PREJUDICE.@  Accordingly, because Harris could not be held
liable for gross negligence even if we were to remand this case on the
vicarious liability claims, we agree that the Farlows= points
as to their allegations of gross negligence liability based on ratification and
managerial capacity are moot.  See
Williams v. Lara, 52 S.W.3d 171, 184 (Tex. 2001) (A[A]ny
prospective relief we might grant cannot help them.@); In
re H&R Block Fin. Advisors, Inc., 262 S.W.3d 896, 900 (Tex. App.CHouston
[14th Dist.] 2008, orig. proceeding) (A[A]n
issue may be moot if it becomes impossible for the court to grant effectual
relief for any reason.@).  Accordingly, we overrule their third and
fourth points.








                                     VI.  Evidentiary Rulings

In their fifth point, the
Farlows claim that the trial court abused its discretion by excluding testimony
from Marty Farlow that when she and Lee were waiting for him to be taken into
the emergency room, a woman whom she believed to be a Hospital employee told
her that Athe doctors that worked there
were good doctors and they would take care of@ Lee.

Harris objected to this testimony on hearsay
grounds, contending that because Marty did not know the identity of the woman
who made this statement to her, it could not be imputed to the Hospital and,
thus, was not admissible as a statement against interest.  It also objected on relevancy grounds.

A.     Standard of Review








A trial court=s
rulings in admitting or excluding evidence are reviewable under an abuse of
discretion standard.  In re J.P.B.,
180 S.W.3d 570, 575 (Tex. 2005).  An
appellate court must uphold the trial court=s
evidentiary ruling if there is any legitimate basis in the record for the
ruling.  Owens-Corning Fiberglas Corp.
v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). 
To determine whether a trial court abused its discretion, we must decide
whether the trial court acted without reference to any guiding rules or
principles; in other words, we must decide whether the act was arbitrary or
unreasonable.  Cire v. Cummings,
134 S.W.3d 835, 838B39 (Tex. 2004).  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances. 
E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549,
558 (Tex. 1995).

B.     Analysis








For a hearsay statement to be admissible under
rule 801(e)(2)(D), the proponent of its admission must show that the statement
was made by an employee or agent acting within the scope of authority.  Stensrud v. Leading Edge Aviation Servs.
of Amarillo, Inc., 214 S.W.3d 98, 99 (Tex. App.CAmarillo
2006, no pet.); Trencor, Inc. v. Cornech Mach. Co., 115 S.W.3d 145, 151
(Tex. App.CFort Worth 2003, pet. denied)
(holding that agency must be proven and may not be presumed).  Here, Marty did not know the identity of the
woman she talked to; she assumed the woman was an employee because she Apresume[d]
that everybody at the hospital works at the hospital.@  She did not know if the woman was a nurse,
clerk, member of the administrative staff, or volunteer.  She never saw whether the person was wearing
a badge.  Although Marty testified that
she thought the woman was in charge of getting people back into the emergency
room because people would talk to her and then go back into the emergency room,
she could not testify as to any indicia of control or agency relationship
necessary to impute any actions of this unidentified woman to the
Hospital.  Accordingly, we cannot say
that the trial court=s ruling was arbitrary or
unreasonable.  See Stensrud, 214
S.W.3d at 100B01.  Moreover, even if the trial court had abused
its discretion in refusing to admit the evidence, the error would be harmless
in light of the evidence that the Hospital=s
admissions forms disclaimed any agency relationship between Harris and the
doctors who perform services at the Hospital. 
See Tex. R. App. P. 44.1(a)(1). 
We overrule the Farlows= fifth
point.

VII. 
Cumulative Evidentiary Rulings

The Farlows= sixth
and final point complains about multiple trial court rulings excluding evidence
that they contend, when evaluated cumulatively, resulted in the rendition of an
improper judgment.  In particular, the
Farlows contend that the trial court reversibly erred by refusing to admit
evidence of the following:  (1) Marty=s
testimony regarding the woman who told her and Lee that the Hospital=s
doctors would care for him; (2) that the scrubs Dr. Fewins wears have the
words, AProperty
of Harris Methodist Fort Worth,@ written
on them; and (3) that the plaque on the wall in the emergency room references Aour
physicians, nurses, and medical staff.@  [Emphasis added.]

We have already determined that the trial court
did not abuse its discretion by refusing to admit Marty=s
testimony and that even if it did, any error was harmless.








As to Dr. Fewins=s
scrubs, there is no evidence that Lee ever saw him wearing the scrubs or that
he relied on the language on the scrubs in forming a belief that Dr. Fewins or
Harris was holding Dr. Fewins out as Harris=s
agent.  Although Emily testified that Dr.
Fewins was wearing scrubs when he spoke to her in the waiting room after the
surgery, there is no evidence that she was influenced by the language written
on them.  Thus, the trial court did not
abuse its discretion by refusing to admit this evidence.  See Tex. R. Evid. 401, 402; Denton,
998 S.W.2d at 296B97.








There is likewise no evidence that any of the
Farlows saw or relied on the wall plaque in forming a belief as to whether Dr.
Fewins was Harris=s agent.  Thus, we cannot say that the trial court
abused its discretion in refusing to admit this evidence.  See Tex. R. Evid. 401, 402; Denton,
998 S.W.2d at 296B97.  Moreover, as with Marty=s
testimony, the scrubs and plaque evidence, even if considered to show an
affirmative holding out by Harris of its doctors as employees, was negated by
evidence that Harris included language in its admissions paperwork specifically
disclaiming any such relationship.  See,
e.g., Baptist Mem=l Hosp.
Sys., 969 S.W.2d at 950; Valdez, 975 S.W.2d at 45B46,
48.  Thus, even if the trial court abused
its discretion by refusing to admit this evidence, we cannot say that any such
error, cumulatively or individually, resulted in the rendition of an improper
judgment.  See Tex. R. App. P.
44.1(a)(1); Warrantech Corp. v. Computer Adapters Servs., Inc., 134
S.W.3d 516, 529 (Tex. App.CFort
Worth 2004, pet. dism=d).  We overrule the Farlows= sixth
point.

                                             Conclusion

Having overruled the Farlows= six points,
we affirm the trial court=s judgment.

 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  CAYCE, C.J.; LIVINGSTON
and GARDNER, JJ.

DELIVERED:  May 7, 2008  











[1]Emily sued in the
following capacities:  individually, as
next friend of her son Andrew Joseph Farlow and her daughter Lauren Catherine
Farlow, and as guardian of the person and estate of her husband, Lee William
Farlow.





[2]THR is the Hospital=s parent company; it is a
nonprofit that also owns several other hospitals.  THR and the Hospital are referred to
collectively in this opinion as AHarris.@





[3]The trial court did not
specify whether it was granting the motion on traditional or no-evidence
grounds.





[4]The Farlows had entered
into a high-low settlement agreement with Dr. Fewins, which the trial court
incorporated into its judgment.





[5]The parties each point us
to a different test to determine the relationship between Harris and the
Farlows.  Harris contends that St.
Joseph Hospital sets forth a physician-specific independent contractor test
that displaces prior case law:  whether
there has been a Abenefit to the defendant
and . . . right of control.@  St.
Joseph Hosp., 94 S.W.3d at 537.  But
this test applies to only one of several vicarious liability theories the
plaintiff in that case pled as an alternative to respondeat
superior.  Id. at 537.  TheAnonemployee on a mission@ theory of liability is
for Arespondeat superior
liability outside the employment context.@  Id. at 537 (emphasis added); Omega
Contracting, 191 S.W.3d at 847; see Comm. on Pattern Jury Charges,
State Bar of Tex., Tex. Pattern Jury Charges: General Negligence and
Intentional Personal Torts PJC 7.10 (2008). 
The Farlows did not plead this nonemployment-based theory of vicarious
liability; thus, this test is not applicable and does not displace the Newspapers,
Inc. contract-between-the-parties-controls-absent-evidence-otherwise test.

 

Conversely,
the Farlows urge that we use the five-factor test set out in Limestone
Products Distribution, Inc., 71 S.W.3d at 312, to the exclusion of the Newspapers,
Inc. test.  But the Limestone
factors assist us only in determining whether the evidence of right of control
despite the explicit contract language raises a fact question as to whether Dr.
Fewins was an employee.  See Farrell
v. Greater Houston Transp. Co., 908 S.W.2d 1, 3 (Tex. App.CHouston [1st Dist.] 1995,
writ denied) (recognizing that Newspapers, Inc. controls respondeat
superior analysis when contract provides for independent contractor status but
then employing Limestone factors to analyze whether evidence of control
was sufficient to overcome contract language).





[6]Norman explained that new
doctors typically needed help relocating because they owed money on student
loans.





[7]All amounts paid by the
hospital to Dr. Fewins are in separate sealed parts of the clerk=s record and are redacted
from documents in the unsealed part of the clerk=s record.





[8]Norman explained that Dr.
Fewins was required to be on-call once every three weeks.





[9]As Norman explained, the
Agreement Adefines what the
expectations are both from the hospital standpoint and from the physician=s standpoint in the
community.@  Harris was thus Ainterested in seeing this
physician develop his own practice within the community[,] . . . practice on a
full-time basis, provide us with assistance with the emergency department call.@





[10]For example, Norman
testified that the doctors are required by law to comply with the Hospital=s documentation requirements.





[11]The Hospital President
and Risk Manager also serve on the Medical Board, but they do not have the
power to vote.





[12]Although the Farlows
maintain that the Hospital scheduled the surgery to meet its time and needs,
the deposition testimony of Dr. Fewins, which they cite, is clear that he
wanted to start the procedure at 5:00 p.m., but he could not start at that time
because there was already a trauma procedure in the operating room; however, he
could have started Lee=s surgery that evening if
he had wanted to.  Instead, not knowing
how long the trauma would take, he decided to do the surgery on Saturday
morning, depending on availability of the operating room.  The Farlows presented no evidence contradicting
this testimony.





[13]The Farlows rely on
language in Dalehite v. Nauta, stating that the argument that the
hospital did not control Athe details of the
diagnosis or treatment@ by the doctor Aproves too much.  If [this] argument were correct, then no
physician could ever be an employee, not even via ostensible agency.A  79 S.W.3d 243, 245B46 (Tex. App.CHouston [14th Dist.]
2002, pet. denied).  But although that is
the same argument urged by Harris hereCone which we need not address based on our
dispositionCthat case is
distinguishable on its facts because Dr. Nauta

 

was chairman of the UTMB
department of neurosurgery; worked full‑time as a professor of
neurosurgery, treating patients and instructing medical students at UTMB;
signed an employment contract, was paid a salary, and provided with employee
benefits and insurance; and received an office, support staff, and equipment
necessary to do his work from UTMB. 
Appellants themselves alleged in their petition that Nauta was an
employee of UTMB, so that UTMB was liable for his actions.

 

Id. at 245.





[14]Emily testified that no
one represented that Dr. Fewins was or was not in training; regardless, she did
not think he was a doctor in training. 





[15]Emily was not able to
stay at the Hospital with Lee because she had to return home to care for their
children.  As far as she knew, there was
no one else there other than Lee and Dr. Fewins when Lee signed the form the  morning of the surgery.





[16]We note that at least
some of the advertisements contain small print indicating that the doctors who
work at the Hospital are Aindependent practitioners@ and not employees;
however, because not all of the advertisements so state, we will assume, for
the sake of analysis, that the advertisements are confusing or misleading as to
whether the individuals shown are doctors.





[17]Because the Farlows did
not go forward with their allegations of direct negligence against Harris,
their allegations related to gross negligence could refer only to Harris=s alleged vicarious
liability for Dr. Fewins=s gross negligence.