**TRENCOR, INC., Appellant,**

v.

**CORNECH MACHINE CO. a/k/a CMC Iran, Appellee.**

**No. 2–02–001–CV.**

Court of Appeals of Texas, Fort Worth.

Aug. 7, 2003.

---

McDonald Sanders, P.C., Stuart B. Lumpkins, Jr., Fort Worth, Chambliss, Bahner & Stope, P.C., W. Jeffrey Hollingsworth, Alicia Brown Oliver, Chattanooga, for Appellant.

Law Offices of Frank L. Branson, P.C., C. Michael Clark, Dallas, for Appellee.

Panel A: CAYCE C.J.; DAY and LIVINGSTON, JJ.

## OPINION

JOHN CAYCE, Chief Justice.

Trencor, Inc. appeals the trial court's judgment awarding Cornech Machine Co. a/k/a CMC Iran $344,380.88 in damages plus post-judgment interest, attorney fees, and court costs for breach of contract. In three issues, Trencor challenges the trial court's admission of alleged hearsay evidence, the admission of post-warranty documents, and the sufficiency of the evidence

to support the jury's finding that Trencor's obligation to pay CMC was not excused. We will affirm.

## Background Facts

This suit arises from a contract dispute between CMC and Trencor. CMC is a foreign corporation organized under the laws of Iran by its principal, Ashgar Manavi, to represent foreign companies doing business in Iran. Trencor is a local manufacturer of trenching equipment headquartered in Grapevine, Texas.

On June 24, 1991, Manavi and Trencor entered into a written agency agreement for the sale of equipment in Iran. As Trencor's agent, Manavi was to assist in negotiating a contract with Sugarcane Development Company, a branch of the Iranian government, for the sale of drainage trenchers. While contract negotiations were still ongoing, the Iranian government enacted a law requiring all foreign companies doing business in Iran to have local representation in the country. In response, Trencor's then-president, Jerry Gilbert, executed a formal letter confirming CMC as its sole representative in the Iranian territory and giving CMC its permission to retain spare parts of machinery and equipment in its workshop to ensure efficient after-sales service to Trencor's Iranian clients. Pursuant to Iranian law, Trencor executed a letter of commitment and a letter of advertisement appointing CMC as its after-sales service agent.

In 1993, Sugarcane entered into a formal contract with Trencor for the purchase of fifteen drainage trenchers, a five-year supply of spare parts, and gravel trailers. Trencor agreed to warrant the equipment to be free from defects in workmanship and materials for a period of one year after delivery to the initial user. If any parts or accessories of the equipment covered by the warranty were proven defec-tive within the warranty period, Trencor agreed to replace the defective parts or accessories. Trencor also agreed to provide eighty-six days of on-site training for the "commissioning" of the equipment in Iran and a $425,000 performance bond guaranty to ensure that it performed its obligations under the sales contract. To fulfill this obligation, Trencor entered into an agreement with three technicians from Cyprus to set up the equipment and train the Sugarcane operators.

Although Trencor began shipping the goods in January 1994, the first trenchers did not arrive in Iran until June 1994. At this time, Trencor and CMC entered into a written after-sales service agreement. This agreement contained three clauses: 1) the after-sales service clause, 2) the warranty clause, and 3) the termination clause.

Under the after-sales service clause, Trencor was to pay CMC five percent "of each transaction concluded for and on the Iranian territory to cover CMC staff fees" and to provide free of charge "[a]ny special tools necessary for the service and maintenance" of the products subject to the agreement. CMC was to provide after-sales service for all the products sold by Trencor "as from the date of finalized training." The warranty clause obligated CMC to "look after the warranty on behalf of the COMPANY as from the date of finalized training" for any equipment subject to the after-sales service clause if CMC acted as an exclusive seller and representative for Trencor's products. Trencor agreed to replace, free of charge, all equipment containing components that were "nonfunctioning, damaged or do not work correctly." If Trencor replaced CMC as its agent in Iran, under the termination clause, Trencor was required to prepare a letter of commitment and advertisement appointing a new agent. Accord-

ingly, CMC's obligations would be transferred to the new agent.

In September 1994, when Trencor's technicians began commissioning the machines, they realized that many of them had been damaged in the shipping process and that the spare parts Trencor had agreed to provide were missing from the shipment. Although Trencor itself had no contractual responsibility for this damage, the technicians could not perform and complete the required "startup" or "commissioning" necessary to complete the delivery of the machines without repairing the damaged equipment.

Once the machines were operational, Trencor's technicians discovered that when the hydraulic steering system on the trenchers was operated at the correct pressure, the track drive gearboxes would become temporarily disengaged from the teeth of the sprockets on the gearboxes and skip. The technicians knew that this condition, if not remedied, would place an inordinate strain on the final drives of the machines and could cause gear breakage and gearbox failure. Zoltan Kelemen, the more experienced technician, notified Trencor of this problem and then tried to "jury rig" the problem by lowering the pressure of the hydraulic system. However, when he did so, the machines would travel in a straight line and could not turn. When Kelemen elevated the pressure back to the appropriate level, the chains would "skip."

In October 1994, Trencor's technicians also began training operators and technicians at the Sugarcane job site. Ultimately, due to delays from inclement weather in Iran and scheduling difficulties with Trencor's technicians, the training was not completed until July 1995.

On October 15, 1995, CMC was notified of a problem with the laser alignment system on the machines. Trencor took the position that CMC should provide the required service under the agreement. CMC technicians investigated the problem, and after some initial difficulties caused by Trencor's failure to provide the appropriate manuals and tools, CMC technicians and Kelemen satisfactorily resolved the problem. At trial, Kelemen testified that this problem was a warranty issue because it was caused by the incorrect placement of the laser on the machine.

On November 11, 1995, in the course of CMC's initial investigation of the problem with the laser system, CMC discovered that the final drive gearbox on one of the machines had broken. By July 1996, the gearboxes on at least two other machines had also failed. In May 1997, Trencor finally agreed to send Kelemen to investigate the cause of the gearbox failures. In a secret internal memorandum written before Kelemen's visit, Trencor's export manager wrote:

> Very Important—no mention of new replacement gear boxes is to be made until technician is at job-site and reports his findings that old gearboxes are not repairable and must be replaced. If we discuss in advance of trip, then we show that we have knowledge of poor design.

Indeed, Kelemen found that the final drives of ten machines had failed and concluded that this failure was due to faulty machines.

After Kelemen's May 1997 visit, Trencor refused to respond to any and all communications from Manavi and CMC. Manavi sent letters requesting reimbursement for the expenses CMC had incurred in connection with Kelemen's trip and warning Trencor of the consequences of further ignoring his communications. When this correspondence was ignored, Manavi notified Trencor that it had failed to respond to his numerous letters and that if it con-

tinued to do so, he would regard Trencor to be in breach of its contractual obligations. However, again Trencor ignored Manavi's letter. In July 1997, CMC's attorney in Switzerland, Philippe Reymond, wrote a formal demand letter to Trencor, notifying Trencor that it was in breach of its obligation to pay CMC five percent of the Iranian trencher deal pursuant to the after-sales service agreement, and accusing Trencor of causing serious damage to the standing of CMC in Iran. Trencor's counsel acknowledged receipt of the letter and promised he would send a "substantive response" by the end of August 1997. When no such response was received, CMC's counsel wrote once more, noting that Trencor's failure to meet its own self-imposed deadline for a "substantive response" was further evidence of Trencor's failure to comply with its obligations.

On October 20, 1997, Trencor's new president, Roger Sandberg, wrote to Trencor's competitor, Inter–Drain, and, acknowledging that there were still outstanding warranty issues concerning the gearboxes, proposed that Trencor work with Inter–Drain to fulfill Trencor's obligations to Sugarcane. Inter–Drain then sent Trencor a settlement proposal whereby Trencor would settle Sugarcane's $350,000 claim "for the repair/replacement of faulty final drives." By using the funds set aside to pay CMC's commission to purchase spare parts at a cost of between $200,000 and $250,000 for shipment to Sugarcane, the final cost to Trencor would be "nearly nihill [sic]." Trencor agreed. Although the agreement with CMC was still in full force and effect and had not been terminated, Trencor introduced Inter–Drain to Sugarcane as its new agent. Thereafter, Trencor completed negotiations to ship $500,000 worth of spare parts to Sugarcane in the face of two U.S. embargos. Trencor, however, never advised CMC that it was making such a sale and

shipment to Iran and secretly handled the entire affair through Inter–Drain. CMC did not discover that this transaction had occurred until after it filed suit and obtained discovery from Trencor.

## Procedural History

On March 31, 1999, CMC sued Trencor for breach of the after-sales service agreement alleging that Trencor was obligated to pay CMC five percent of the purchase price of the trenchers in addition to the commission CMC had received under the agency agreement. Trencor alleged that the commission provided for in the after-sales service agreement only applied to future sales and not the equipment that had already been sold and delivered to Sugarcane. Alternatively, Trencor alleged that its duty to pay CMC was excused because CMC had never satisfied its obligation to perform warranty work on the trenchers.

On July 10, 2001, the case was tried to a jury. Over Trencor's hearsay objection, the trial court admitted several "Service Reports" prepared by CMC employees in Iran. These reports detailed services performed by CMC under the after-sales service contract. The trial court also overruled Trencor's objection to the relevance of several documents detailing events that occurred after the one-year manufacturer's warranty on the machines had expired. In rebuttal, Trencor introduced Kelemen's testimony that CMC personnel were not at the job site very often and that only one CMC employee completed training. Trencor also produced testimony that CMC did not perform or assist with warranty work on the trenchers during the one-year manufacturer's warranty period provided by Trencor.

The jury found that the after-sales service agreement applied to the trenchers;

the parties had agreed that Trencor would pay CMC five percent of the net sales price in exchange for CMC's performance of its obligations; Trencor breached its obligation to pay CMC five percent of the trenchers' purchase price; $344,380.88 would fairly and reasonably compensate CMC for Trencor's failure to comply with the agreement; Trencor was not excused from paying CMC; Trencor had committed fraud; and CMC did not suffer any damage from the fraud.

The trial court rendered judgment on the verdict on July 26, 2001. Trencor then filed two motions for judgment notwithstanding the verdict or in the alternative, motions for new trial alleging the grounds asserted in this appeal. The trial court denied both motions.

### Admissions by a Party Opponent

■ In its first issue, Trencor contends that the trial court erred in admitting the Service Reports prepared by CMC employees while CMC was Trencor's agent as admissions by a party opponent under Texas Rule of Evidence 801(e)(2).

■ The admission and exclusion of evidence is a matter within the trial court's discretion. Absent an abuse of that discretion, we will not disturb a trial court's decision to admit or exclude evidence. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995). A court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex.2002); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

■ According to the rules of evidence, a statement is not hearsay if it is offered against a party and is "the party's own statement." TEX.R. EVID. 801(e)(2); *see also* FED.R.EVID. 801(d)(2). A statement by a party's agent or servant concerning a matter within the scope of his agency or employment and made during the existence of the relationship may be offered as an admission by the party itself. TEX.R. EVID. 801(e)(2)(D); *see also* FED.R.EVID. 801(d)(2) advisory committee's note 2(C) (stating that the rule is broad enough to include statements made by the agent to the principal). The fact of agency must, however, be established before the declaration can be admitted. *Tex. Gen. Indem. Co. v. Scott*, 152 Tex. 1, 253 S.W.2d 651, 655–56 (1952); *see also Buchoz v. Klein*, 143 Tex. 284, 184 S.W.2d 271, 271 (1944) (holding that agency relationship cannot be presumed; it must be proven).

■ The determination of whether an agent's statements are admissible against the principal as an admission of a party opponent in a suit between the agent and principal requires the court to look at the circumstances prevailing at the time the statements were made. *Cf. Securities & Exch. Comm'n v. Geon Indus., Inc.*, 531 F.2d 39, 43 n. 3 (2d Cir.1976) (holding that employee's testimony, given after he had been suspended from employment, was not admissible against employer because it was evident at time statement was made that parties could have conflicting interests); *see also United States v. King*, 134 F.3d 1173, 1176 (2d Cir.1998) (recognizing that federal rule 801(d)(2) does not allow an agent's statements to be imputed to the principal if the parties have conflicting litigation positions); *United States v. Summers*, 598 F.2d 450, 458–59 (5th Cir.1979) (holding that statements made by agent after agent began cooperating with the FBI were inadmissible against principal, while statements made beforehand were admissible).

Here, the evidence clearly establishes that CMC was Trencor's agent in Iran for after-sales service and warranty work. As evidence of the agency relationship, CMC produced copies of Trencor's letters of commitment and advertisement appointing CMC as its agent as well as the after-sales service agreement. The "Service Reports" Trencor objects to detail the services provided by CMC with regard to the Sugarcane trenchers. Clearly, the reports concern matters within the scope of the agency relationship. Further, CMC prepared the reports between 1994 and 1996, during its agency relationship with Trencor. Thus, the reports meet the requirements for admission as statements made by Trencor's agent.

At the time CMC prepared these reports, the parties were not adverse to one another. CMC prepared the last report in July 1996. The conflict between CMC and Trencor did not arise until September 1997 after Trencor failed to respond to CMC's attempts to obtain payment under the contract. Therefore, under these circumstances, we cannot say that the trial court abused its discretion by admitting the reports as party-opponent admissions. We overrule Trencor's first issue.

### Relevance of Post–Warranty Events

■ In issue two, Trencor argues that the trial court erred in admitting documents detailing events that occurred after its one-year manufacturer's warranty on the trenchers expired on September 30, 1995. It alleges that documentation of any warranty work performed by CMC after the warranty expired is not relevant to the issues in the case and is highly prejudicial to Trencor.

To be admissible under the Texas Rules of Evidence, evidence must be relevant to the issues in the case. Tex.R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401.

In this case, the jury was asked to determine whether Trencor's failure to pay CMC five percent of the net proceeds of the sale of the trenchers to Sugarcane was excused. Further, the jury was instructed that Trencor's failure to comply was excused if CMC had failed to comply with a material obligation of the after-sales service agreement it entered into with Trencor. Under the agreement, CMC agreed to provide after-sales service on the trenchers for five years from the date of finalized training. Thus, any work CMC performed, even after the one-year manufacturer's warranty had expired, was relevant to the jury's determination of whether CMC fulfilled its obligation to perform after-sales service and whether Trencor's failure to pay CMC was excused.

In addition, Mason McCullough, Trencor's export manager, testified that the fact that the one-year manufacturer's warranty expired in September 1995 meant nothing. Trencor remained responsible for any problems with the equipment even after the warranty expired because Sugarcane had not released its performance bond guaranty.[1] Therefore, the trial court did not abuse its discretion by admitting this evidence. *Downer,* 701 S.W.2d at 241–42. Accordingly, we overrule issue two.

---

**1.** Trencor posted a $425,000 performance bond guaranty to assure Sugarcane that it

would deliver quality equipment.

### Sufficiency of the Evidence

In issue three, Trencor argues that the evidence is legally and factually insufficient to support the jury's finding that it was not excused from paying CMC its commission. In the jury charge, the court submitted the following question:

Was Trencor's failure to pay CMC Iran 5% of the net proceeds of the sale of the trenchers to Sugar Cane Development Company excused?

You are instructed that failure to comply by Trencor is excused if you find that CMC Iran failed to comply with a material obligation of the After Sales Service Agreement Warranty.

Answer "Yes" or "No."

ANSWER: <u>No</u>

Excuse is an affirmative defense upon which Trencor, as the defendant, had the burden of proof. *See* TEX.R. CIV. P. 94. When an appellant is attacking the legal sufficiency of an adverse answer to an issue on which he had the burden of proof, the appellant must overcome two hurdles. First, the record must be examined for evidence that supports the finding or failure to find, while ignoring all evidence to the contrary. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex.1991). Second, if there is no evidence to support the finding or failure to find, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.; Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

In reviewing a complaint asserting that an adverse finding or failure to find is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames*, 776 S.W.2d 154, 158–59 (Tex. 1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). If a jury's finding or failure to find an issue is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the factual sufficiency complaint should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt*, 159 Tex. 305, 320 S.W.2d 815, 816 (1959) (op. refusing writ n.r.e.); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

When Trencor sold the trenchers to Sugarcane, Trencor agreed to warrant the equipment to be free from defects in workmanship and materials for a period of one year after delivery to the initial user.[2] If any parts or accessories of the equipment covered by the warranty were proven defective within the warranty period, Trencor agreed to replace the defective parts or accessories.

To ensure its ability to honor its warranty obligations, Trencor entered into an after-sales service warranty agreement with CMC. Under the terms of the agreement, CMC was required to provide the after-sales service and warranty work on the trenchers from the date of finalized training. In return, Trencor was required to supply, free of charge, any special tools necessary for the service and maintenance of the equipment as well as replacement parts for any parts that were nonfunctioning, damaged, or did not work correctly during the warranty.

---

**2.** However, Trencor's export manager, Mason McCullough, testified that Trencor remained responsible for warranty work on the trenchers until Sugarcane released their performance bond guaranty. The bond had not been released in October of 1995 when CMC performed the work on the trenchers.

The evidence shows that while the trenchers were under warranty CMC began to experience problems with the trenchers' laser light systems and gearbox assemblies. These defects were covered by the warranty. The evidence further shows that CMC investigated and assisted Trencor's technician in repairing the laser alignment system and requested that Trencor provide it with parts and manuals to aid it in repairing the systems. Upon discovering that the trenchers' gearboxes had been broken during the initial set-up of the trenchers, CMC paid a Trencor technician to repair the gearboxes. We conclude that this evidence supports the jury's failure to find that CMC failed to comply with a material obligation of the after-sales service warranty agreement. Thus, we hold the evidence is legally sufficient to support the jury's adverse finding on Trencor's excuse defense.

We also conclude that the jury's failure to find that Trencor was excused from paying CMC the five percent commission is not against the great weight and preponderance of the evidence. The only evidence in the record that CMC did not perform a material obligation of the after-sales service warranty agreement is the testimony of Jerry Gilbert, Trencor's then-president, and Zoltan Kelemen, a Trencor technician. Gilbert testified that, to his knowledge, CMC never requested payment from Trencor for any work it allegedly performed under the agreement. Kelemen testified that CMC did not have a service team capable of servicing the trenchers at any time between September 1994 and May 1997. Kelemen, however, testified that a CMC engineer had attempted to fix the problem, but was unsuccessful. In addition, Kelemen stated that after diagnosing the problem with the laser system, he left it to the CMC engineer to make the necessary adjustments.

After reviewing the entire record, we cannot say that Gilbert's and Kelemen's testimony is of such great weight and preponderance that the jury's failure to find that CMC did not comply with a material obligation of the after-sales service warranty agreement is manifestly unjust. Therefore, we hold that the jury's failure to find that Trencor was excused from its contractual obligation to pay CMC the five percent commission is not against the great weight and preponderance of the evidence. Accordingly, we overrule Trencor's third issue.

## Conclusion

Having overruled Trencor's issues, we affirm the trial court's judgment.