**Opinion issued August 30, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

### NO. 01-11-00675-CV

————————————

**BRYAN L. SIMS, Appellant**

**V.**

**LOUISIANA TRANSPORTATION, INC., Appellee**

On Appeal from the County Court at Law No. 2
Harris County, Texas
Trial Court Case No. 931,244

## MEMORANDUM OPINION

Appellant, Bryan Sims, challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Louisiana Transportation, Inc. ("LTI"), in LTI's suit against Sims for breach of contract. In two issues, Sims contends that the evidence

is legally and factually insufficient to support the jury's findings that LTI's breach of contract was excused and his breach of contract was not excused.

We affirm.

## Background

On January 4, 2007, LTI, which operates a transportation business, entered into a Consultant's Agreement with Sims for him, as an independent contractor, to provide LTI consulting services in LTI's development of a "break bulk" business. LTI agreed to pay Sims $6,234 per month "for each month worked," reimburse him for reasonable business expenses, and pay him a bonus of one-half percent to one percent of certain revenue if he achieved a sales target minimum of $1,250,000 per quarter. The Consultant's Agreement was for a one-year term, which would renew annually. In the event that either party desired to terminate the agreement, "cancellation [would] require 30 day written notice."

Two days after executing the Consultant's Agreement, Sims executed a Demand Promissory Note as "an addendum to the Consulting Agreement," which evidenced that LTI had agreed to "loan" him $20,000. The Promissory Note provided,

> PAYBACK AMOUNT $20,000 plus interest due 12/31/07 less and except any principal amounts deducted pursuant to bonus compensation distribution set forth in [the] Consulting Agreement unless termination of Consulting Agreement at which time Demand Promissory Note is in default and hereinabove default provisions would be in force. It is agreed and understood that loan funding will

2

be in 4 installments of $5,000 distributed on the tenth day of each month until fully funded.

The Promissory Note further provided that the "entire principal and any accrued interest shall be fully and immediately payable UPON demand of any holder thereof." Sims authorized LTI "to deduct the payback amount" from his "bonus compensation to be paid pursuant to the Consulting Agreement."

On January 4, 2008, LTI and Sims executed a Renewal and Amendment to the Consultant's Agreement, which provided that the Consultant's Agreement was amended, among other things, to grant Sims a 2% commission in "all revenue . . . in excess of the annual revenue budget in place for new accounting year." The Renewal Agreement also reaffirmed that "[a]ll bonus proceeds [were] to be applied" to the Promissory Note.

On March 10, 2008, LTI sent Sims a letter stating that it had "elected to terminate and not renew" the Consultant's Agreement. On March 18, 2008, LTI and Sims executed a Commissioned Agent Agreement, which provided that Sims would work for LTI in the capacity of a commissioned agent and his commission would be increased to 8%.

LTI subsequently filed suit against Sims, alleging that he had breached the Consultant's Agreement and Promissory Note by not repaying the $20,000 loan. LTI sought to recover its damages in the amount of $20,000, plus interest and attorney's fees. Sims filed verified and general denials and a counter-claim for

breach of contract against LTI, alleging that LTI had agreed to pay him a "sign-on bonus" of $20,000. Sims further alleged that LTI had breached the Consultant's Agreement by not providing him 30-days' notice of termination, not paying him compensation in the amount of $56,106 "for the remaining months under the [Consultant's] [A]greement," and not reimbursing him for out-of-pocket expenses in the amount of $1,850. Sims also asserted a fraud claim against LTI, alleging that LTI had made material false representations to him. Sims sought actual and exemplary damages and attorney's fees.

At trial, both parties introduced into evidence the relevant contractual documents described above. Additionally, Sims and Ralph Castille, vice president of LTI, testified.

Sims testified that, under the Consultant's Agreement, he had the ability to "earn" a bonus if he reached certain target sales goals. For example, if he made a quarterly sales target of $1,250,000, i.e., annual sales of $5 million, he was entitled to receive a bonus of approximately $25,000 for the year. Sims agreed that the express terms of the Promissory Note reflected that he owed LTI $20,000 less any amount deducted for any bonus compensation he earned; if he earned a bonus, it "would go to pay this note"; he would be in default of the Promissory Note if he failed to pay it; and "if [he] failed to earn a bonus, [he] still owed the $20,000 to [LTI]." Sims acknowledged that he received the $20,000 from LTI in four

4

separate monthly payments of $5,000, he had never paid LTI the $20,000 or earned any portion of it, and LTI had demanded repayment. He also agreed that he had sold "far short" of the $5 million sales target under the Consultant's Agreement in 2007, he had not been paid any bonuses for 2007, and he had never asked for a bonus for his work in 2007.

Sims noted that the parties' Renewal Agreement modified the Consultant's Agreement because they were not "making quite as much money" as expected. Sims explained that this occurred because LTI had him performing duties other than developing business. Under the Renewal Agreement, Sims's bonus program was "reworked," but any bonus he earned was still to be applied to the Promissory Note. Sims did not meet the sales targets in the Renewal Agreement or earn any bonus in 2008 prior to LTI's termination of the contract.

Sims further testified that, despite the express terms of the above written documents, he and LTI had a different "oral agreement" that the $20,000 payment was actually a sign-on bonus that he was not required to repay, even though he never earned a bonus under the terms of the Consultant's Agreement. Sims asserted that, prior to entering into the Consultant's Agreement, he had asked for a sign-on bonus, and Castille told him, "[W]e can't call it a bonus and we'll have to call it" something else "to circumvent the people at headquarters." Sims also asserted that because LTI had included the $20,000 payment in a 1099 tax form

that it submitted to the Internal Revenue Service ("IRS"), "it [was] no longer a loan."

Sims stated that LTI terminated the Consultant's Agreement on March 10, 2008 without providing him a reason for doing so, and he orally complained that he had not been given 30-days' notice. Sims noted that, in LTI's contract termination letter, it did not make any mention of the outstanding loan. However, Sims agreed that, shortly after the contract terminated, he voluntarily entered into the Commissioned Agent Agreement with LTI. After entering into the Commissioned Agent Agreement, Sims did not send any business to LTI, and he agreed that he "dropped" the agreement.

Sims asserted that LTI was indebted to him under the Consultant's Agreement for $1,850 for reimbursable expenses, and he introduced into evidence a letter from LTI admitting that it owed him this amount. Sims agreed that LTI had paid him for every month that he had worked. He also agreed that the Consultant's Agreement allowed either party to terminate the agreement at any time with 30-days' notice.

Castille testified that the $20,000 payment made by LTI to Sims was "always a loan" and LTI had agreed to provide it to Sims so that he could resolve some personal tax liabilities. Castille explained that the Promissory Note was "tied to the bonus," so that, if Sims achieved sales goals, any bonus revenue earned

6

under the Consultant's Agreement would "retire a portion of the debt associated with the loan." Castille noted that he had discussed this fact with Sims before he signed the Promissory Note, and Sims "understood."

Castille stated that Sims never achieved the sales targets prescribed in the Consultant's Agreement and Renewal Agreement, even though he had represented he could achieve them. And Sims never repaid the loan. Castille noted that LTI had been disappointed in Sims's performance in 2007. Accordingly, LTI, in the Renewal Agreement, agreed to "focus" Sims's duties, incentivize Sims by increasing his bonus percentage, and decrease Sims's sales targets. Castille also noted that the Renewal Agreement also specifically mentioned applying Sims's bonus proceeds to repay the Promissory Note.

Castille explained that when Sims continued to underperform in 2008, LTI decided to terminate the Consultant's Agreement, but LTI looked for "alternatives." During Castille's conversation with Sims in which he informed Sims that LTI intended to terminate the Consultant's Agreement, he offered Sims the opportunity to work with LTI as a commissioned agent. At that time, Sims told Castille that he would consider this offer. Shortly thereafter, Sims entered into the Commissioned Agent Agreement with LTI.

Castille acknowledged that LTI had not provided Sims 30-days' notice before terminating the Consultant's Agreement, but he explained that this was

7

because LTI was "interested" in pursing the "agency agreement" with Sims. Castille explained that the Commissioned Agent Agreement represented an "opportunity" for Sims and a "win-win" for both Sims and LTI. Castille noted that, under the Commissioned Agent Agreement, Sims could have achieved higher bonuses than he was previously entitled to receive under the other agreements. In light of Sims's agreement to the change in the parties' relationship, LTI did not provide Sims 30-days' notice or compensate Sims for any period following termination of the Consultant's Agreement. And, at the time that he and Sims discussed termination of the Consultant's Agreement and entering into the agency agreement, Sims did not raise any concern about not receiving 30-days' notice. Rather, Sims understood that LTI's offer of an agency agreement represented "a great opportunity" and Sims "agreed to the agency agreement with the valuable consideration that was being offered to him by taking" an existing "book of business" and "grow[ing] it to the levels" that Sims thought were achievable.

LTI offered, and the trial court admitted, into evidence an internal e-mail in which Castille had indicated to others at LTI that, if Sims ultimately chose not to enter into the Commissioned Agent Agreement, LTI could "discuss some debt forgiveness in lieu of notice." Castille explained that, if Sims had not signed the Commissioned Agent Agreement, LTI was "going to honor the 30 day notice" and

8

address compensation for that period, which would have been applied to the Promissory Note.

In regard to LTI's submission of the 1099 tax form to the IRS, Castille explained that the $20,000 payment had been included on the tax form because it was "a loan tied to a bonus" and LTI's accounting department instructed how the payment should be handled for tax purposes. Castille noted that Sims had originally complained to him about LTI's inclusion of the payment on the 1099 tax form because Sims considered it a "loan." To Castille's knowledge, LTI never issued a new 1099 tax form, and this issue remained with LTI's "accounting and legal" departments. Castille acknowledged that LTI owed Sims approximately $1,850 in expenses, and he stated that this issue, along with the outstanding debt owed by Sims, was addressed by LTI's legal department.

The jury found that both Sims and LTI failed to comply with the Consultant's Agreement, "which included as an addendum the Demand Promissory Note." The jury further found that Sims's failure to comply was not excused but that LTI's failure to comply was excused. The trial court had instructed the jury that Sims's failure to comply was excused if (1) LTI "previous[ly] fail[ed] to comply with a material obligation of the same agreement"; (2) LTI waived compliance; or (3)(a) LTI "by words or conduct made a false representation or concealed material facts," "with knowledge of the facts or with

9

knowledge or information that would lead a reasonable person to discover the facts," and with the intention that [Sims] would rely on the false representation or concealment in acting or deciding not to act" and (b) Sims did not know and had no means of knowing the real facts and relied to his detriment on the false representation or concealment of material facts. The trial court had further instructed the jury that LTI's failure to comply was excused if (1) "compliance [was] waived by [Sims],"[1] (2) "the parties agreed that a new agreement would take [the Consulting Agreement's] place," or (3) Sims "previous[ly] fail[ed] to comply with a material obligation of the same agreement."

The jury awarded LTI damages in the amount of $18,150 for Sims's breach, necessarily deducting the portion of reimbursable expenses that LTI had acknowledged that it owed to Sims. The jury also found that LTI had not committed fraud against Sims. And, the trial court entered judgment in favor of LTI, awarding it damages of $18,150 for breach of contract and its attorney's fees, costs, and interest.

**Standard of Review**

We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2)

---

[1] The trial court had further instructed the jury that "[w]aiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right."

10

rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id*. at 822. If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "'[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

11

In conducting a factual-sufficiency review, we must consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that each party seeking to establish the affirmative defense of excuse for its failure to comply bore the burden of proof on that defense. *See Trencor, Inc. v. Cornech Mach. Co.*, 115 S.W.3d 145, 153 (Tex. App.—Fort Worth 2003, pet. denied) (citing TEX. R. CIV. P. 94) (stating that excuse is affirmative defense upon which defendant has burden of proof). When a party is challenging the factual sufficiency of a finding on an issue upon which that party had the burden of proof, that party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). When a party attacks the factual-sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial, it must show that there is insufficient evidence to support the adverse finding. *Vongontard v. Tippit*, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**LTI's Breach**

In his first issue, Sims argues that the evidence is legally and factually insufficient to support the jury's finding that LTI's failure to comply with the Consultant's Agreement was excused because there is no evidence that he waived his right to recover under the Consultant's Agreement, he failed to comply with a material obligation prior to LTI's failure to comply, or he agreed to a novation of the Consultant's Agreement.

In regard to waiver, Sims asserts that there is no evidence that he "intentionally relinquished his to right to recover his $1,850 in expense money," his "compensation for the 30 day notice period in March 2007 for $6,234," or his "remaining nine months of the Consultant's Agreement totaling $56,106." Sims notes that he testified that he was never told that, when LTI terminated the Consultant's Agremeent and he agreed to enter into the Commissioned Agent Agreement, that agreement would "replace the Consultant's Agreement thereby giving up his aforementioned rights."

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). To prove waiver, a party must show that the other party to the contract had knowledge of the right and remained silent or inactive for an unreasonable period of time or engaged in intentional conduct inconsistent with

13

that right. *Tenneco, Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). The question of waiver is ordinarily one of fact. *Tenneco*, 925 S.W.2d at 643. Because waiver is largely a matter of intent, a court must consider the words, acts, and conduct of the parties. *See Mandell v. Mandell*, 214 S.W.3d 682, 692 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Robinson v. Robinson*, 961 S.W.2d 292, 299 (Tex.App.-Houston [1st Dist.] 1997, no writ); *see also EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 89 (Tex. 1996).

First, we note that LTI never disputed that it owed Sims $1,850 in reimbursable expenses under the Consultant's Agreement. LTI acknowledged this amount in correspondence to Sims prior to litigation, and it continued to acknowledge this debt throughout the litigation and trial. However, LTI also presented evidence that it retained this payment in light of Sims's refusal to honor his debt reflected by the Promissory Note. The jury necessarily found that the $20,000 payment from LTI to Sims constituted a loan or an advance that was to be earned pursuant to the Consultant's Agreement or repaid by Sims. And, as

14

discussed below, LTI presented ample evidence that the $20,000 payment consitued a loan for which LTI was entitled to recover. Second, the matters that the parties primarily contested at trial were whether the $20,000 payment represented a sign-on bonus and whether Sims was entitled to damages for LTI's failure to provide 30-days' notice of termination. Sims concedes in his appellate briefing that the jury found that LTI failed to comply "on the *only* ground . . . alleged, that LTI terminated [the Consultant's Agreement] without giving him 30 days written notice." Thus, in considering the sufficiency of the evidence to support the jury's finding of excuse, we analyze the evidence that Sims waived his right to seek damages for LTI's failure to provide him 30-days' notice of termination of the Consultant's Agreement.

LTI presented evidence, through the testimony of Castille, that when it terminated the Consultant's Agreement, Sims did not object to LTI's not providing him 30-days' notice or compensation for that notice period. Rather, Castille testified that he and Sims discussed transitioning their relationship from the Consultant's Agreement to a commissioned-agency relationship. Castille further testified that, after thinking about LTI's proposal, Sims expressed that "he was in agreement with that particular change," and, based upon this fact, notice was not necessary. LTI also introduced into evidence internal LTI correspondence demonstrating that Castille had raised the issue of compensating Sims for the

15

notice period with others at LTI, and the decision to compensate Sims was dependent upon whether Sims chose to enter into a new agency relationship with LTI. If not, according to Castille, LTI would have provided Sims compensation for the notice period through "debt forgiveness." Castille also explained that LTI had offered Sims a new agency relationship on an "eat-what-you-kill basis" and the "sky [was] the limit in terms of the compensation [Sims] could make" under the new Commissioned Agent Agreement. Castille noted that Sims had an "entrepreneurial spirit," and he anticipated that Sims might have a "better focus" and improved performance under the new agreement. LTI even granted Sims rights to an existing book of business, and it told him that it would "throw in all the business and customers that had been created while he was . . . on the salary" under the Consultant's Agreement. Castille's testimony supports an implied finding that Sims, by accepting from LTI an increased percentage on his commissions, revenues from and access to existing business, and other valuable consideration, agreed to enter into a new relationship, which necessarily terminated the Consultant's Agreement. Thus, LTI was not required to provide 30-days' notice of termination of the Consultant's Agreement, and Sims waived any right to compensation in exchange for maintaining a modified business relationship with LTI. In sum, when asked if LTI had was required to give Sims 30-days' notice of termination of the Consultant's Agreement, Castille specifically testified,

16

With the understanding that the conversation [Sims] and I had was that he was going to agree to the agency agreement and was going to take over the existing business at 8% commission; and because he was entering into this second agreement, that the 30-day notice situation would not be required.

Although Sims offered contrary testimony that he had orally complained about a lack of notice, LTI presented sufficient evidence to create a fact issue on whether Sims, by agreeing to enter into the Commissioned Agent Agreement, intentionally waived his right to 30-days' notice of termination of the Consultant's Agreement.[2] Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's implied finding that Sims waived his right to 30-days' notice of termination of the Consultant's Agreement finding and, thus, its express finding that LTI's breach was excused.

We overrule Sims's first issue.

## Sims's Breach

In his second issue, Sims argues that that the evidence is legally and factually insufficient to support the jury's finding that Sims's failure to comply with the Consultant's Agreement was not excused because, among other things, there is "uncontroverted evidence" of LTI's prior material breach and LTI waived its right to repayment of the $20,000.

---

[2] Sims presented no evidence that he would have been entitled to compensation for the entire remaining year on the Consultant's Agreement. The terms of the documents support, at most, a claim for compensation during the 30-day notice period.

17

Sims's argument concerning LTI's prior material breach is based upon his assertion that the $20,000 payment constituted a sign-on bonus rather than a loan or advance that Sims was required to earn. LTI presented documentary evidence and testimony that the payment from LTI was a loan, which Sims was required to repay. Also, as addressed above, the evidence supports the jury's implied finding that, by entering into the Commissioned Agent Agreement, Sims agreed to waive any required notice of termination of the Consultant's Agreement. Thus, there is legally and factually sufficient evidence to support the jury's finding that LTI did not commit a prior material breach of the Consultant's Agreement that excused Sims's breach.

Sims's argument concerning LTI's alleged waiver of its right it to seek repayment of the $20,000 is primarily based upon the evidence that LTI submitted to the IRS a 1099 tax form that included the payment, Sims paid taxes on this payment, Sims always disputed that he had received a loan, and LTI never issued a corrected 1099 tax form. However, LTI presented ample evidence demonstrating that the $20,000 payment constituted a loan. Castille also testified that the tax treatment of the payment had been handled according to LTI's accounting department, and Sims did not present any evidence that this tax treatment converted the payment from a loan to a bonus that he was not required to repay. Additionally, LTI presented evidence that, when LTI made the $20,000 advance to

Sims, all parties expected that Sims would earn that amount during the term of the Consultant's Agreement and would pay the Promissory Note by earning his bonus. Thus, there is legally and factually sufficient evidence to support the jury's finding that Sims's failure to comply with the Consultant's Agreement was not excused by any waiver by LTI of its right to seek repayment of the $20,000.

Finally, Sims's argument concerning fraud is based upon his testimony that Castille informed him that the contractual documents had been drafted in such a way as to "circumvent" "headquarters," as well his other testimony that he understood the $20,000 payment to be a sign-on bonus, which Sims was not required to repay. However, Castille disputed that any such conversation occurred, and the jury could have considered the contrary documentary evidence in rejecting Sims's fraud allegations. Thus, there is legally and factually sufficient evidence to support the jury's finding that Sims's failure to comply with the Consultant's Agreement was not excused by LTI's commission of fraud. In sum, we hold that the evidence is legally and factually sufficient to support the jury's finding that Sims's failure to comply with the Consultant's Agreement was not excused.

We overrule Sims's second issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.